## FITZPATRICK v. THE STATE.

1  CRIMINAL PRACTICE:  *Entering finding of indictment on record.*
When an indicted party is not in custody, the clerk should not disclose upon the record that an indictment has been found against him. It is sufficient for the record entry of the finding of an indictment to describe it by number, and an indictment endorsed with the same number and date of filing as the number mentioned in the entry of that date, will be sufficiently identified as the one filed.

·2.  PRACTICE IN SUPREME COURT:  *Wrong but innocent instruction.*
Though an instruction be inapplicable, and calculated to mislead the jury, if the facts show. that it did not have that effect, and other proper instructions were given on the same point, this court will not reverse.

3. PRACTICE IN CIRCUIT COURT: *Summing up evidence.*
The Constitution of 1874, in effect, prohibits judges from summing up the evidence, as under the common law practice.

4. CRIMINAL LAW: *Murder; manslaughter.*
Where parties quarrel, separate, arm themselves, and again meet and enter mutually into a fight, with deadly weapons, and one kills the other, or kills a third person in an attempt to kill his adversary, it may be murder or manslaughter, according to the time intervening the first and second difficulties, and opportunity for cooling.

5. INSTRUCTIONS: *To be considered together.*
Any one of several instructions given, should be considered in connection with the others, and with reference to the different phases of the evidence, in view of which the instructions were framed.

6. CRIMINAL LAW: *Murder in first degree.*
To constitute murder in the first degree, there must be the specific intent to take life, formed beforehand and carried out with deliberation.

APPEAL from *Phillips* Circuit Court.
Hon. J. N. CYPERT, Circuit Judge.

*M. T. Sanders*, for appellant:

It is an elementary principle that where fresh provocation intervenes, the act will be imputed to that, rather than to previous malice, unless conclusively proven that the killing was upon antecedent malice. The special instructions given for the State were nearly all predicated upon preconceived malice, and misled the jury.

Murder and the distinction between murder and manslaughter are the same, under our Statute, as at common law. *Bivens* v. *State*, 11 *Ark.*, 455. The characteristics of murder are malice and deliberation; of manslaughter, their absence. If Tujague had been slain, it would only have been manslaughter, and killing Tool would not be a

higher grade of homicide, unless the jury believed appellant had a specific intent to take his life.

If the killing of Tool, whether intentional or accidental, was the result of passion, * * * it was not murder in either degree.

A party who moves an instruction has the right to have it distinctly given or refused in the language he puts it. *Stanton* v. *State*, 13 *Ark.*, 317.

The first, and particularly the second, instructions for the State were misleading, in that they restricted the jury to provocation, offered by the deceased alone. Though correct, in the abstract, they, in effect, told the jury they could take no notice of any provocation by Tujague, however grievous, nor of any of the circumstances of the main contest. It was an error of omission, to leave to the jury the determination of what is legal "provocation." *State* v. *Crafton*, 6 *Iredell*, 164 ; *Payne* v. *Commonwealth*, 1 *Met.*, (*Ky.*), 370.

The proposition that an error shown in the record, in instructing the jury as to murder in the first degree, is cured by acquittal of murder in that degree, is untenable. Error without injury cannot be applied to offenses of this high grade. *Mitchell* v. *State*, 60 *Ala.*, 26 ; *Witt* v. *State*, 6 *Cold.*, 5 ; *People* v. *Williams*, 18 *Cal.*, 187.

The fourth and sixth instructions for the State were erroneous ; first, because they deprived the appellant of the benefit of that part of the evidence which tended to prove that he abandoned the contest, and started on his way home ; second, it was instructing the jury that the guilt of the accused must turn exclusively and solely upon the intent with which he may have returned to the saloon, regardless of the facts attending the difficulty which ensued. *Atkins* v. *State*, 16 *Ark.* ; *Murray* v. *State*, 1 *Ct. Appeals* (*Tex.*), 420.

The sixth is abstract. Facts cannot be stated hypothetically, which do not appear in evidence. Where the jury might, if correctly instructed, have rendered a different verdict, this court will award a new trial. *Bizzell* v. *Booker*, 16 *Ark.*, 309 ; also, *Lombard* v. *Martin*, 10 *George*, 157 ; *Southern R. R. Co.* v. *Kendricks*, 40 *Miss.*, 584 ; *Hanks* v. *Naglee*, 54 *Cal.*, 51 ; *People* v. *Valencia*, 43 *Cal.*, 552 ; *Anderson* v. *State*, 3 *Heis.*, 86.

The eighth and tenth are too broad and misleading. A person when attacked by another, who manifestly intends to take life, or do great bodily harm, is not obliged to retreat, but may pursue his adversary, until he has secured himself from danger, and if he kill him in so doing, it is self-defense. 1 *East's P. C.*, 271 ; 2 *Stark. Ev.*, 721 ; *Luby* v. *Commonwealth*, 12 *Bush.* (*Ky.*), 1 ; *Bohannon* v. *Commonwealth*, 8 *Bush.* (*Ky.*), 481.

The twelfth was erroneous. It assumes that there was evidence that Tujague abandoned the conflict in good faith.

The fourteenth is vague, indefinite and erroneous. It assumes the two difficulties to be one contest, and authorized the jury to deduce that no subsequent assault by Tujague could justify appellant.

The rule is civil cases, that Courts of Appeal will not grant a new trial upon the facts, does not prevail in felonies. *Davis* v. *State*, 2 *Humph.*, 439 ; *Copeland* v. *State*, 7 *Humph.*. 479.

It does not affirmatively appear that the indictment was brought into court by the grand jury. *Chancellor* v. *State*, 33 *Ark.*, 315.

*Moore, Attorney-General*, contra :

The record shows that the grand jury returned unto court true bills numbered 11 to 18, inclusive, and indictment numbered 16 was against appellant. This is " affirm-

Fitzpatrick v. The State.

ative " and sufficient. *Shropshire* v. *State*, 12 *Ark.*, 191, quoted with approbation. *Green.* v. *State*, 19 *Ark.*, 186.

That Tool and appellant were friends *cuts no figure in the case.* The law holds him responsible precisely as if he had slain Tujague.

The court did not err in striking out a portion of the 10th instruction for appellant. *Stanton* v. *State*, 13 *Ark.*, 317, where it is held that if an entire instruction be good in part, and objectionable in part, *it will not be error* if the entire instruction be overruled. The court might have refused the entire instruction, but it chose to modify it so as to make it good law.

Similar instructions to the 1st and 2d were approved in *Sweeney* v. *State*, 35 *Ark.*, 585.

1. Entering upon the record the finding of an indictment.

ENGLISH, C. J. I. It is submitted by counsel for appellant that the record does not affirmatively show that the indictment was returned into court by the grand jury.

The term of the Circuit Court of Phillips county, at which appellant, Robert M. Fitzpatrick, was indicted for murder in the first degree, commenced, and the grand jury was organized, seventeenth of May, 1880.

On the twentieth of May the following entry appears :

Now, on this day, comes the grand jury into open court, and having answered to their names, returned, through their foreman, eight bills of indictment, which, being numbered 11, 12, 13, 14, 15, 16, 17 and 18, were ordered filed and process to issue immediately."

Then follows, in the transcript, the indictment against Robert M. Fitzpatrick, charging, in substance, that on the tenth of February, 1880, in the county of Phillips, he murdered John Tool by shooting him with a pistol ; which is endorsed 16, and marked filed twentieth of May, 1880.

When the accused is not in custody, it is not proper for

the clerk to disclose upon the record that an indictment has been found against him by naming him in an entry ( *Gantt's Dig.*, secs. 1798, 1800). The indictment in this case is sufficiently identified by its number and date of filing, as one of the eight shown, by the above entry, to have been returned into court the twentieth of May. *Shropshire* v. *State*, 12 *Ark.*, 190 ; *Green* v. *State*, 19 *Ib.*, 186.

II. Appellant was tried on plea of not guilty. The jury found him guilty of murder in the second degree, and fixed his punishment at fifteen years imprisonment in the penitentiary ; a new trial was refused, bill of exceptions taken, he was sentenced in accordance with the verdict, and prayed an appeal, which was allowed by one of the judges of this court.

The 1st, 2nd and 3rd grounds of the motion for a new trial, were that the verdict was contrary to. law, contrary to evidence, and against both.

That John Tool was shot with a pistol on the night of the tenth of February, 1880, between 10 and 11 o'clock, in the saloon of Mose Tinney, at Helena, during a *mardi gras fete*, and died soon after receiving the mortal wound, the evidence leaves in no doubt.

There was also evidence to warrant the jury in finding that he was shot by appellant.

The saloon fronted east, the counter was on the right ; there was an entrance at the back, or west end of the house, as well as in front, and a beer garden in the rear. The front entrance was screened.

A. King, witness for the State, testified, among other things, that he was sitting on a box in the saloon looking at Tool, about eight feet from him ; that Tool was sitting with his back to the shelving—squatting down with his left side towards the east end of the house and towards witness. That appellant came up to the east end of the counter (from

the front entrance) in a stooping position and presented his pistol towards Tool, who, motioning his hands towards him, said, "don't shoot, Bob" (appellant was familiarly known by the name of Bob), and about that time the pistol fired, and a second after Tool remarked, "I've caught it," or words to that effect. He was a bar-tender.

Further on, the same witness said appellant fired as soon as he got to the east end of the counter; and that was the time Tool motioned him not to shoot, and that was the shot that killed Tool. Again, witness said he saw appellant's face when he shot, and he knew he killed Tool.

Tom Robinson testified that he knew the parties; was in the saloon, near the ice-box, when Tool was killed, and knew appellant killed him.

D. C. Reed, a policeman, testified that on the night of the difficulty, he, the city marshal, and others, had appellant in custody, and he made a statement in his presence; said he killed Tool, and did not know what he did it for. It appears that the others did not hear this statement.

The doctors proved that the pistol ball entered the left side of Tool and ranged down.

There were but three persons [appellant, his brother, Thomas Fitzpatrick and Frank Tujague], who used fire arms in the fight, and Tool must have been killed by one of them. It could not have been Thomas Fitzpatrick, for he used a double barrel shot gun, charged with small shot, and Tool was killed with a pistol ball. Tujague entered the saloon at the west end, and fired his pistol toward the east.

T. D. Ramage, who was present, but did not see who shot Tool, testified that if he was sitting from four to six feet from the east end of the counter, between the counter and shelving, with his face to the south, and shot in the left side, it was not possible for Tujague to have killed him. He was a witness for defense.

Alonzo Fitzpatrick, brother of and witness for appellant (who was present, and armed, but did not engage in the fight), testified that if Tool was sitting in the position as described by other witnesses, it was not possible for him to have been shot by Tujague, from the west, etc.

No doubt, from the evidence, Tool's left side was to the east, and appellant, who was manifestly in a rage, fired his pistol repeatedly and wildly, from the east towards the west.

The above feature of the evidence is stated in response to a suggestion of counsel for appellant, that it was not satisfactorily proved that he shot Tool. The jury found, by their verdict, that he did, and there was evidence to sustain the finding.

As to the grade of homicide, the evidence was conflicting. If the jury believed the witnesses for the State (and none of them were impeached), they properly found appellant guilty of murder. On the version given of the whole quarrel and fight between the Fitzpatricks and Tujague, (in which Tool was shot), by some of the witnesses for the defence, the jury might have found that the homicide was of a lower grade than murder. We will notice other features of the evidence not indicated above, in considering the instructions.

III. After the evidence was closed, the court read to the jury certain sections of the Digest relating to the grades of homicide, self defense, etc., which are referred to in the bill of exceptions ; and then gave twelve [misnumbered fourteen] instructions, moved by the attorney for the State, appellant objecting to each and all of them.

For appellant sixteen instructions were moved, the court refused the 9th, modified the 6th and 10th, and gave all of the others as asked.

The evidence as set out in the bill of exceptions is long and confused. A brief statement of leading facts, however,

will be sufficient to make remarks upon the instructions understood.

It was a festival occasion ; the parties and eye witnesses were at a saloon, and probably all drinking. The Fitzpatricks commenced the quarrel. About 10 o'clock at night, Tujague, who was in costume, and at the back door of the saloon, attempted to detain a woman who wanted to leave ; and Thomas Fitzpatrick, hearing the altercation between him and the woman, came up and struck him. Appellant also approached, and there being a pistol on a shelf, Tujague attempted to get it, but was prevented by Tool. While he was struggling with Tool for the pistol, appellant caught hold of him and bit his aim. Released by the interference of a by-stander, he ran out of the saloon in front, (making utterances which will be noticed hereafter), and went off, appellant pursuing him for some distance. Appellant returned to the saloon, and asked Tool for his pistol, which it seems, was under the counter ; Tool at first refused to give it to him, but was finally prevailed on to let him have it ; and he and his brothers went to Thomas Fitzpatrick's gun shop, not far off. It is evident that they knew from what Tujague said, when he left the saloon, that he intended to return to it. At the shop, Thomas Fitzpatrick charged a breech-loading gun with small shot. On being asked why he did not put buck-shot in the gun instead of the small shot, " he said they would do, he wanted to burn him," meaning, no doubt, Tujague. The three returned to the saloon, appellant armed with his pistol, and his brother Thomas, with his shot-gun.

In the saloon, several witnesses stated, appellant walked backward and forward, watching the back door—cocked his pistol several times—every time the back door was opened— said if Tujague came back there would be trouble ; if he came in at the back door he would kill him.

After a while, a witness for the defense states, Thomas took a drink, and said, "let us go, not three brothers pitch on one man;" and Alonzo put his hand on appellant's shoulder, and said, "come on Bob, and let's go;" and they went to the front door, but did not go away.

Meanwhile, Tujague went to his saloon, took off his costume, dressed in citizen's suit, put on his overcoat, and placed a Smith & Wesson's pistol in each of his pockets. In about half an hour, (more or less, the witnesses differing as to time), from the time he had left Tinney's saloon, he returned to it, and entered at the west door.

There was a front screen, and if, as stated by some of the witnesses, Thomas Fitzpatrick was on a front step, and appellant on the side walk, when Tujague entered the saloon, they were not perhaps in his view.

He says that he stopped about midway of the saloon, and remarked that he was ready to defend himself; others testified that he said he was "ready to fight any son of a bitch in the house." Was asked to drink and declined. Had his hands in his overcoat pockets. It is probable that the Fitzpatrick's hearing him in the saloon, returned, passed the screen, Thomas in advance, with shot gun in hand, and that Tujague fired at him, and ran back out of the saloon into the beer garden in the rear. Some of the witnesses say that while retreating, he fired a second, and others, a third time. He testified that he fired but once, and in this he is corroborated by some of the witnesses for the state, and it is probably true, for he was arrested by the sheriff, and his pistols taken from him and examined shortly after the fight, and but one chamber was empty, as testified by the sheriff and others present.

It is probable from all the evidence, that six shots were fired, first shot by Tujague at Thomas Fitzpatrick, who fired one barrel of his shot gun while Tujague was retreat-

ing, and four pistol shots by appellant, who probably had his pistol in readiness when he entered the saloon and passed the screen. It seems that Tujague, and perhaps appellant, fired three shots after he was out of the saloon. Which one of appellant's four shots was fatal to Tool, does not distinctly appear.

Taking all the instructions given by the court together, it appears to have been fairly left to the jury to decide upon the conflicting and confused testimony, whether appellant was guilty of murder, manslaughter, or was acting in self-defense. Of course the jury were advised, that though the fatal shot fell on Tool, with whom appellant had been friendly, yet the offense was the same, if any, as if Tujague had been killed.

(a) The first and second instructions given for the state, were taken from the opinion of this court in *McAdam* v. *State*, 25 *Ark.*, 408–9, and were approved as correct expressions of law in *Sweeny* v. *State*, 35 *Ark.*, 585.

But one of them, the second, related to murder in the first degree, and it follows:

"If the jury believe from the evidence that the defendant, at the time he fired the pistol, intended to kill the deceased, and did kill him without any provocation, they will find him guilty of murder in the first degree. "

This instruction was no doubt given in view of the testimony of witnesses King and Reed, the former having stated that when appellant presented his pistol towards Tool, he raised his hands and implored him not to shoot; and the latter, that appellant said he had killed Tool, and he did not know what he did it for. The same instruction was given in *Harris* v. *State*, 36 *Ark.*, 127, in which the accused was found guilty of murder in the first degree, and it was held that the instruction was inapplicable to the facts, and

improperly given, because all the evidence showed that the killing was upon provocation.

It is not probable, from all the evidence in this case, that appellant purposely killed Tool, and the above is the only instruction given for the State submitting to the jury the question whether such might have been his intention, and the jury by their verdict, in effect, found it was not.

The counsel for appellant submits that the jury may have been misled by the giving of any instruction on the subject of murder in the first degree; to which it may be replied, first, that the verdict shows that they were not misled; and second, that the 2d, 3d, 4th, 5th and 7th instructions given for appellant, framed and moved by the same learned counsel, related to murder in the first degree, and the court gave them in the strong clear language in which they were drafted, favorable as they were to appellant. The seventh of them was, that "The absence of a motive to take life should be considered by the jury in determining whether it was done willfully, deliberately, and with malice aforethought, and if it appears to the jury from the testimony, that the defendant had no motive to kill the deceased (Tool), and was on friendly terms with him at the time, and had had no difficulty with him, these facts are proper to he considered in determining the *animus* of the defendant."

*2. Prac-tice in Supreme Court:*

*When misleading instruction does not mislead.*

(*b*) Counsel for appellant criticises the *fourth* and *sixth* instructions given for the State, making no objection here to the *third* and *fifth*.

The *fourth* was:—"If the jury believe from the evidence that previous to the killing of deceased, defendant, Thomas Fitzpatrick and witness, Frank Tujague, had a difficulty, and after such difficulty went off, armed themselves with deadly weapons, and returned to renew the contest, and in that contest deceased was accidentally killed by defendant,

it would be either murder or manslaughter—murder if sufficient time had elapsed for passion to cool, and reason to be restored, and manslaughter if the contest was renewed in the heat of passion, and not in a spirit of revenge.''

The *sixth* was :—''If the jury believe from the evidence that defendant, Thomas Fitzpatrick and witnesss Tujague, had an altercation in the saloon ; that Tujague left the saloon stating that he was going off to arm himself, and would return and have it out, and that defendant and his brother Thomas knew, or believed, that Tujague would return, and they went off and armed themselves with deadly weapons, returned to the place of rencounter to meet Tuja-gue, and in the difficulty following such preparation deceased was killed by defendant, it would be murder or manslaughter in the defendant, and the jury will so find, whether the killing was accidental or not.''

It is submitted that both of these instructions were erro- neous on two grounds ; first, that they deprived appellant of the benefit of that part of the evidence which tended to prove that he abandoned the contest, and started on his way home ; and second, that they made his guilt turn solely upon the intent with which he may have returned to the saloon, regardless of the facts attending the difficulty which ensued, etc.

If these two instructions were all that were given, they might be subject to the objections stated, but they were not all. They were given upon one view of the conflicting evidence, and others were given upon another view, and among them, the sixteenth, moved for appellant, which was as follows :

''If the jury believe, from the evidence, that defendant and Thomas Fitzpatrick withdrew from the saloon, intend-ing to abandon the contest, and did so to avoid further diffi-culty, and that Tujague renewed the difficulty with a deadly

weapon, in a fierce and dangerous manner, after defendant. had retired in good faith, Tujague became the assailant,. and if the defendant had killed him, believing it necessary to save his own life, or his person from a great bodily injury, actually impending at the time, his act would have been justifiable homicide.''

It is also submitted that the sixth instruction is subject to the further objection of being abstract. That there was no proof ''that Tujague left the saloon, stating that he was going off to arm himself, and would return and have it out,'' and none that appellant went off and armed himself,. and returned to meet Tujague.

Alonzo Fitzpatrick, brother of appellant, testified that Tujague said, when leaving the saloon : ''I've got no show here ; fix yourselves. I'm going away and will come back fixed.''

It is manifest, from the testimony of this witness, and others, that the Fitzpatricks understood, from what Tujague said on leaving the saloon, that he intended to arm himself and return to it. It may not be literally true that appellant ''went off and armed himself,'' for it appears that his pistol was in the saloon, under the counter, when Tujague left ; that after pursuing him for some distance, he returned to the saloon, got his pistol, and went to the shop, where the brothers prepared themselves with arms, and returned to the saloon, expecting Tujague to come back armed.

The facts stated hypothetically in the sixth instruction, 3. PRAC-TICE IN may not have been literally in evidence, but they were sub- CIRCUIT COURT: stantially. The instruction assumes no facts to be true, or Summing-up evide- to have been proved, but declared what the law was upon nce. the facts stated hypothetically, if the jury believed, from the evidence, that such were the facts ; a mode of instructing a jury allowable under the present Constitution, which,

in effect, prohibits the judges from summing up the evidence, as under the common law practice.

(c) It is submitted that the *eighth* and *tenth* instructions for the State were too broad and misleading; that a person, when attacked by another who manifestly intends to take his life, or do him great bodily harm, is not obliged to retreat, but may pursue his adversary, until he has secured himself from all danger; and if he kill him in so doing, it is justifiable self-defense.

The instructions so complained of follow:

"Eighth—If the jury believe, from the evidence, that the fight between defendant, Thomas Fitzpatrick, and witness, Frank Tujague, was mutual, or entered into by the parties willingly, and in that affray deceased was accidentally shot by defendant, you will find the defendant guilty of murder, or manslaughter, according to the circumstances in the case, and in that case, it would make no difference who struck the first blow, or fired the first shot."

·1. CRIMI-
NAL LAW:
Murder.
Manslaug-
hter.

"Tenth—If the jury believe, from the evidence, that the defendant could have, at any time, from the beginning of the first difficulty to the ending, when deceased was killed, reasonably withdrawn from or avoided the difficulty, without immediate danger to himself, and failed to do so, he could not justify the killing by self-defense:—A man cannot set up self-defense, until he has done everything reasonable in his power to prevent, abandon and retreat from the difficulty."

The eighth instruction was given in view of the first quarrel between the parties, referred to in other instructions of the series. No doubt, where parties quarrel, separate, arm themselves, and again meet and enter mutually into a fight, with deadly weapons, and one kills the other, or one of them kills a third person, in attempting to kill his adversary, it may be murder, or manslaughter, according

to the time intervening between the first and second diffi-culties, and opportunity for cooling.

And such is the substance and effect of the eighth instruction, taken in connection with others given, and in view of evidence as to the first quarrel and the final fight.

The counsel for appellant objects particularly to the word "*retreat*," as used in the last clause of the tenth instruction.

The court had read to the jury the 1285th section of the Digest, which defines self-defense, in which the words, "that the slayer had really, and in good faith, endeavored to *decline* any further contest, before the mortal blow or injury was given," are used, and perhaps the tenth instruction was needless. But it is evident, from the language employed in the whole instruction, that the court did not mean to charge the jury that a man was obliged to retreat when attacked, etc.

On the contrary, the court charged the jury by the thirteenth instruction moved for appellant that, "A man has the right to repel force by force, in defense of his own person, against one who manifestly intends, by violence or surprise, to take his life, and may *pursue* his adversary, until out of danger, if the attack is of such character as to render the attempt to escape from danger hazardous to life or personal safety."—And in the fifteenth instruction given for the appellant that:—"If danger to defendant was actual, urgent and pressing, he was not bound to flee, but was justified in repelling or preventing the impending danger, by the use of such means as to a prudent and courageous person appeared necessary and reasonable, under the circumstances."

It is impossible to read the evidence without seeing that either Tujague, or the appellant and his brother, Thomas, might have avoided the final fight, and that they prepared

themselves for it, and returned to the saloon where it occurred. True, there is some evidence that appellant, after waiting and watching for Tujague, making hostile demonstrations and threats, was persuaded by his brothers to leave the saloon before Tujague returned, and went front, but did not go away, as he might have done. On the contrary, after Tujague had come back to the saloon, and was boasting of more courage than the sequel showed him to have, Thomas Fitzpatrick and appellant, shot-gun and pistol in hand, returned into the saloon from the front, and passed the screen, when Tujague fired, and fled.

(*d*) The eleventh instruction for the state, and which counsel for appellant criticises, was that:—''If the jury believe, from the evidence, that Tujague, after he fired the first shot, retreated, and in good faith abandoned the conflict, and defendant pursued him, firing at him, and the shot or shots from defendant's pistol took effect upon deceased, and killed him, the defendant would be guilty of murder, or manslaughter.''

5. INSTRUCTIONS: To be considered together. In several of the instructions given, the Court left it to the jury to determine, upon the evidence, whether the killing of Tool was murder or manslaughter, having read to the jury the Statute definitions of those offenses. In other instructions the question of self defense was submitted to the jury, the court having also read to them the Statute defining self defense in ordinary cases of killing. In considering any one instruction given, it is proper to look at it in connection with others of a series given, and also to look at the different phases of the evidence, in view of which the instructions were framed. It is not just to the court below to isolate an instruction and pass upon it, or to criticise its phraseology, as if an independent proposition.

It is probable that Tujague fired the first shot when Thomas Fitzpatrick passed the screen and came in view with

shot gun in hand. He, no doubt, on firing, retreated and that rapidly. It is perhaps not literally true that he retreated in good faith, abandoning the conflict, but more probable that he fled to escape impending danger. Thomas Fitzpatrick, who was doubtless cooler than appellant, appears to have fired but once at his retreating adversary, while appellant fired repeatedly and wildly as above shown.

His firing, under such circumstances, was certainly not in necessary self defense, for he was in no danger at the time. Had there been no previous quarrel and he had fired at the retreating Tujague on the provocation of his having fired the first shot, and killed him, or, by misadventure, Tool, it would not have been murder. But the jury doubtless believed that he fired repeatedly and recklessly at and after Tujague in a spirit of revenge engendered by the previous quarrel.

(b) It is objected that the twelfth instruction (numbered 14 in the transcript) is vague, indefinite and erroneous. That it consolidates the first quarrel and the after fight with arms, assumes them to be one and ignores the interval during which Tujague went to his saloon, armed himself and returned, etc. It is true that this instruction, when considered alone, is subject to the criticism that it confuses the two difficulties, but when considered in connection with others of the series given for the State, and yet others given for the defense, in which the first quarrel and after fight are distinctly kept in view, its want of verbal accuracy could hardly have been misleading. It was perhaps framed, though inaptly, with the view of expressing the proposition that if the jury believed, from the evidence, that the defendant and his brother Thomas brought on the fight with Tujague, the fact that he fired the first shot would not justify defendant in taking his life, or the life of Tool by accident, but it would be otherwise, if defendant had, in good faith, abandoned any further combat after the first difficulty.

Had there been no screen in front and had the Fitzpatricks been in view when Tujague entered the saloon, and had he fired on them before they made any armed movement toward him, the case would have been diffierent.

Construing the instructions given for the State fairly, and as a whole charge, in connection with such as were given for the defense, there appears to be no error of law prejudicial to appellant in them and nothing that could probably have misled the jury. *Thompson on Charging the Jury*, *p.* 173–4.

6. MURDER In the first degree.

IV. The sixth instruction moved for appellant was in these words: " Unless the jury find from the testimony the specific intent to take life, that it was formed before hand and carried out with deliberation, they must acquit the defendant of murder."

To which the court added after the final word " murder," the words " *in the first degree.*"

The *sixth* was of the series of instructions, from two to seven, both included, asked by appellant, relating to murder in the first degree. The court gave, as moved, all but the sixth, and gave it with the additional words above indicated, which made it harmonize with the others. The specific intent to take life and deliberation are features of murder in the first degree, and these expressions in the sixth instruction made the additional words appropriate. *Bivens v. State*, 11 *Ark.*, 455 ; *Sweeney* v. *State*, 35 *Ark.*, 585.

Had the court merely refused the instruction as moved, appellant would have had no just ground of complaint. *Stanton* v. *State*, 13 *Ark.*, 324. But as modified by the court, it was a correct expression of law, and the court had the right to give it in that form, and appellant had the right to except to the refusal of the court to give it in the form moved.

V. The ninth instruction moved for appellant as fol-

lows : "If the jury believe from the evidence, that the killing of Tool, if done by defendant, was not committed with deliberate malice, but that it was done without malice, and in a sudden heat of passion, the killing would be manslaughter only, and if they further believe, from the facts and circumstances of the case, that it was not an intentional or voluntary act on the part of the defendant, *then the offense would be involuntary manslaughter only.*"

The whole of this instruction is marked refused in the margin, and the bill of exceptions states that the defendant excepted to the ruling of the court in refusing to give so much of it as relates to *voluntary* manslaughter ; and the fifth ground of the motion for a new trial is, that the court erred in refusing to grant so much of the ninth instruction asked by the defendant as related to *voluntary* manslaughter.

The first clause of the instruction is not an accurate definition of voluntary manslaughter, which is the unlawful killing of a human being without malice express or implied, and without deliberation, upon a sudden heat of passion, apparently sufficient to make the passion irresistible. *Gantt's Dig.*, *secs.* 1264–5. This definition the court gave in charge to the jury from the Statute.

But the last clause of the instruction, which was an attempt to reduce the homicide to *involuntary* manslaughter, was inappropriate, and the court for that reason might, as it did, refuse the whole instruction. *Stanton* v. *State, sup.*

VI. The form in which the court gave the tenth instruction moved for appellant follows :

"If the jury believe from the evidence, that Tujague, by making a felonious assault upon defendant and his brother Thomas, under circumstances calculated to excite the fears of a reasonable person, that he intended to kill, or that defendant and his brother Thomas were in immediate and pressing danger of receiving great bodily injury, it was law-

17—37

ful for the defendant to employ such means of defense as were reasonably necessary to prevent or overcome the impending danger, provided he really acted under the influence of such fears and not in a spirit of revenge."

And this instruction, so given, was followed by the 11th and 12th, moved for appellant, and given as asked, thus:

"Whether the danger to defendant was real or apparent, if he had reasonable cause as a reasonably prudent man to believe, in order to save his own life, or prevent Tujague from inflicting great bodily injury upon him, that it was necessary to shoot, he was justified in doing so as long as the danger appeared urgent and pressing."

"If the jury believe from the evidence that the defendant was justified, under the circumstances, in firing on Tujague, and during the firing, and while intending or attempting to shoot Tujague, by accident or misadventure, shot deceased, against whom he had no evil design, he is not guilty of the crime charged."

These instructions were as favorable to appellant as the strongest testimony on his side warranted.

It is objected that the court refused to give a part of the tenth, but the instruction was not thereby rendered less favorable to appellant, or its force and value as a legal proposition, in his behalf impaired.

The part of the instruction omitted, was a hypothetical view of the conduct of Tujague before he fired his pistol, some of the expressions of which the court, perhaps, deemed more strongly put than warranted by the evidence.

Upon the whole, the instructions given on both sides fairly submitted the case to the jury, on the different phases of the evidence, and there was no substantial error of law to the prejudice of appellant.

VII. Finally, we have carefully considered all the features of the case in response to the earnest argument of

the learned and zealous counsel for appellant, and though he has sincerely insisted that his client should have been acquitted on the evidence, the jury, the rightful tribunal to weigh the facts, were of a different opinion, and calm reflection may convince him, when the partial view of the advocate has faded out, that the jury were right.

Affirmed.

# CASES ARGUED AND DETERMINED

IN THE

# SUPREME COURT

OF THE

# STATE OF ARKANSAS,

AT THE

# NOVEMBER TERM, 1881.