## NAGEL *v.* STATE.

Opinion delivered May 27, 1929.

*J. P. Kerby* and *G. B. Colvin,* for appellant.

*Hal L. Norwood,* Attorney General, and *Pat Mehaffy,* Assistant, for appellee.

Kirby, J. Appellant prosecutes this appeal from a judgment of conviction of murder in the second degree for killing his father, with punishment fixed at 21 years in the penitentiary.

Joe Nagel, appellant's father, was shot and killed in the dining room of his home in Perry County, on the night of September 9, 1928. In the afternoon of that day appellant, with his brother Henry Nagel, and upon his suggestion, went out into the woods to hunt a bee-tree, and about two miles from home came upon Frank Wohlford, who was in his field looking over his crops, and he accompanied them. They went some distance further together and found a keg of "choc" beer. They all three drank of the beer from a tin-can they found there. Wohlford drank very little, and did not feel the effects of it, but said it was intoxicating, and enough of it would make one drunk. He said none of the three drank enough to indicate that anything was wrong with him. Did not know how many drinks either of the Nagels took.

Henry Nagel stated that he took one or two drinks, and felt the effects of it, and that his brother took three or four drinks.

The appellant stated that he took three or four drinks of the beer, and did not remember anything that happened thereafter until he woke up in jail the next morning, several hours after the killing. The boys separated about dusk, the Nagel boys going home, where they arrived after dark, and the rest of the family had eaten supper. Henry went to the ice-box and got himself something to eat, and appellant remained outside, or on

the back sleeping porch. While there he took his shotgun and loaded it and, as though talking to himself, said: "I see him, there he goes." His sister Helen, in the adjoining room, was alarmed at his actions, and told her father, the deceased, who came into the kitchen just as appellant came to the door off the south porch, with a shotgun in his hand. As they came face to face the father asked him what he was doing with the gun. Appellant answered that some one was trying to steal the chickens. His father told him there was nobody trying to steal the chickens, and took the gun away from him, and reprimanded him about drinking. He slapped the appellant several times, and finally shoved him off the back porch. The father then came back into the house and sat down in a rear room, and a few minutes later a shot was fired through a screen window, striking him in the jaw and resulting in his immediate death. Appellant was taken immediately to the home of his brother-in-law, Charles Strassle, where he stayed until the sheriff arrested him, about 3 o'clock that morning, and took him to jail. A 44 Winchester rifle was found on the back porch, with an empty shell in it, and several witnesses testified that the gun had been recently fired.

While it is true no one saw the shot fired, Baylor House testified that, when being notified of the tragedy on the night it occurred, he went to the home of the deceased, Joe Nagel, found him there dead, examined the rifle, which had been recently fired, and had an empty shell in it. He went to Strassle's house and arrested appellant, and took him to jail. On the way to jail appellant cried, and said: "I did love my daddy, and wish I hadn't done it;" that his father wanted him to leave home, and it would have been better if he had done so. Witness took the rifle to jail the next morning, and appellant pointed to it and said: "If it hadn't been for this thing, this wouldn't have happened." Told witness he got the gun off the back porch and put it down in the corner of the back porch. Witness said

appellant was not drunk at the time he took him into custody.

Henry Nagel testified about going "bee hunting" and finding the "choc" beer, and said that appellant had drunk a little too much of it and was under the influence of it, but admitted that he had previously made a contrary statement to the effect that the appellant was not drunk. He heard the quarrel between his father and brother, and the shot was fired a short time after the quarrel.

His sister testified that she heard the quarrel, and her father had reprimanded the appellant about drinking, and slapped him several times and pushed him off the porch, and about twenty minutes afterwards she heard the shot fired, and her brother and sister took appellant to Strassle's house.

Other witnesses testified about examining the gun that night and finding one empty shell, showing that the gun had been recently fired.

Johnnie, appellant's 16-year-old brother, testified that he and his father were in the dining room when the shot was fired. His father was sitting in a chair, taking off his shoes, and the bullet struck him in the jaw. He had heard the little quarrel between his father and brother about fifteen minutes before the shot was fired, and saw appellant, after the shooting, standing on the back porch. He wanted to come in, but the witness would not let him. Appellant at the time said he was sorry that he did it. He was asked if he did not make a statement at the inquest, and he replied that he did. The statement was read over to him to refresh his memory, and he answered that he had said that. He also saw the rifle on the back porch after the shooting, and it had an empty shell in it.

Although it is true that no one saw appellant fire the fatal shot, the evidence, while mostly circumstantial, warranted the jury in finding him guilty. There was no intimation or proof that any one else was outside

the room where the deceased was sitting, or could have fired the shot that killed him, and we hold that the testimony is sufficient to support the conviction. *Burrow* v. *State,* 177 Ark. 1121, 7 S. W. (2d) 28; *Campbell* v. *State,* 170 Ark. 936, 282 S. W. 4; *Moore* v. *State,* 167 Ark. 164, 267 S. W. 769; *Pierce* v. *State,* 176 Ark. 1205, 4 S. W. (2d) 948; Underhill's Criminal Evidence (3 ed.) §§ 15 and 16.

Neither was error committed in allowing the State's witness, Baylor House, to testify about the rifle found at the home of deceased, with which it was charged appellant shot him. Witness stated that he found the rifle at the house, that it contained an empty shell, and had been recently fired, and that appellant, after he was put in jail, pointed to the gun and stated that if it had not been loaded it would not have happened, and also that he got the gun off the porch, and put it back in the corner of the porch. Other witnesses testified that the gun had been recently fired, and had an empty shell in it, and it was not contradicted that the deceased died from the effects of the gunshot wound. The evidence was admissible as a circumstance throwing light on the homicide and connecting the defendant with the commission thereof. 2 Wharton Criminal Evidence, § 893.

Neither is there any merit in the assignment that the court erred in allowing the prosecuting attorney to impeach the State's witness, Henry Nagel, by asking him if he had not made contradictory statements. The prosecuting attorney stated he was surprised at the statement made by the witness while on the stand, and asked him if he had not made a different statement at the coroner's inquest or the examining trial, to the effect that the appellant was not drunk that day. The State had the right, on being surprised at the testimony of its own witness, to show that he had made a contradictory statement at the examining trial, for the purpose of impeaching his credibility. *Derrick* v. *State,* 92 Ark.

239, 122 S. W. 506; *Brown* v. *State,* 176 Ark. 1203, 3 S. W. (2d) 292.

It is finally contended that the court erred in modifying appellant's instruction C and giving it as modified. The instruction reads as follows, the amendment complained of being included in parentheses:

"There has been some testimony to the effect that, immediately prior to the fatal shot, the deceased had a difficulty with the defendant, and made an assault on him, and threatened him. If you believe that this assault on the person of the defendant by the deceased was sufficient to arouse the passion of the defendant to the point of being irresistible, then you may reduce the crime from murder to manslaughter. The passion that will reduce a homicide from murder to manslaughter may consist of anger or sudden resentment, or fear, or terror; but the passion springing from any of these causes will not alone reduce the grade of the homicide. There must be a provocation which induced the passion and which you deem adequate to make the passion irresistible (and the defendant acted under that passion before a sufficient length of time had elapsed for his irresistible passion to cool). An assault with violence upon another, who acts under the influence thereof, may be sufficient to arouse such passion."

It was a question for the jury whether the defendant, after the provocation given, had reasonable time for the passion to cool and reason to be restored, to regain his self-control. *Fitzpatrick* v. *State,* 37 Ark. 238; *Lindsey* v. *State,* 125 Ark. 542, 189 S. W. 163; *Royer* v. *Belcher,* 100 W. Va. 694, 134 S. E. 556, 47 A. L. R. 1089. The modification of the instruction made by the amendment was in effect explanatory of the statute on the killing of a human being in the heat of passion, and, being a correct declaration of the law, appellant could not have been prejudiced by the court's giving it.

After a careful investigation, disclosing no error in the record, the judgment is accordingly affirmed.