# CARPENTER *v.* STATE.

## Opinion delivered April 18, 1896.

GRAND JURY—INDORSEMENT OF LIST.—A mistake of the jury commissioners in indorsing the list of grand jurors as for the next February term, instead of for the next January term, is not prejudicial, where there was no February term, and such jurors were impaneled and sworn for the January term.

SAME—WAIVER OF OBJECTIONS.—Objections for irregularities in the formation of the grand jury are waived by pleading to the indictment.

FORMER JEOPARDY—SECOND TRIAL AFTER REVERSAL.—Where a judgment of death is reversed in a murder case because the verdict failed to state the degree of unlawful homicide of which defendant was found guilty, the former trial and conviction constitute no bar to a second trial on the same indictment.

CONTINUANCE—WHEN DENIAL NOT PREJUDICIAL.—Denial of a continuance, asked on the ground of the absence of witnesses, is not prejudicial where the facts sought to be established by such witnesses are proved by other and undisputed evidence.

IMPEACHMENT OF WITNESS — FOUNDATION.—Evidence to impeach a witness by proof of contradictory statements is inadmissible where no foundation was laid by interrogating such witness in reference to such statements.

INSTRUCTION—JUSTIFIABLE HOMICIDE.—On a trial for murder in the first degree, it was not error to instruct that justifiable homicide is the killing of a human being in necessary self-defense, or in defense of habitation, person, or property, against one who manifestly intends or endeavors by violence or surprise to commit a known felony, and that if the jury believed that defendant shot and killed deceased while the latter was standing talking to defendant's brother, and not to save his own life or to protect his person from great bodily harm, nor in defense of his habitation, person or property, they should find defendant guilty of murder as charged in the indictment.

SAME—REASONABLE DOUBT.—It is not error to charge the jury that "a reasonable doubt is not a captious, imaginary, or possible doubt, but must be such a doubt as a reasonable man would have in matters of deepest concern to himself, and must arise out of the evidence in the cause."

SAME—CONSPIRACY.—It is not error, in a murder case, to charge the jury that if defendant was present and participated in the killing of deceased, by shooting him with a shotgun,. as charged in the indictment, and that said shooting was done in furtherance of a previous design and understanding between himself and his brother to kill said deceased, and that, as a result of such design and understanding, deceased was killed, you will find him guilty, although it may not be shown that the shot or shots fired by defendant, if any were shot by him, actually caused the death of the deceased.

SAME—JUSTIFIABLE. HOMICIDE.—It is not·error in a murder case to refuse to charge the jury upon the theory that defendant's brother, being in possession of his field, had a right to resist a trespass upon the same by deceased, to the extent of taking deceased's life, and that defendant could lawfully assist him in such resistance.

SAME—SINGLING OUT EVIDENCE.—A request to charge as to the effect the jury might give to the bad character of deceased was properly refused. It is not within the province of the court to select one fact, and suggest to the jury what effect they might give to it.

Appeal from Drew Circuit Court.

WILLIAM F. SLEMMONS, Special Judge.

*Geo. W. Norman, Robert E. Craig,* and *Wells & Williamson,* for appellant.

1. The court erred in striking out the word "threats" in instruction No. 1, asked by defendant.

2. The court erred in refusing No. 3, asked by defendant; and in refusing Nos. 4 and 5.

3. Also in refusing Nos. 7, 8, 9, 10 and 11 asked by defendant.

4. The court erred in giving No. 5, asked by the state; and in giving Nos. 8 and 9.

5. Also in refusing Nos. 3, 4, 5, 6, 7, 8, 9, 10 and 11 as asked by defendant, and not of its own motion giving proper instructions in lieu of them.

6. It was error to refuse a continuance.

7. And to overrule the plea of former jeopardy as to the murder in the first degree.

8. Also to overrule defendant's motion to quash.

9. The court erred in not permitting defendant to prove, by Ben Burgess, a member of the grand jury which found the indictment, evidence given by Sallie Hannibal before said grand jury, and that it was different from her evidence read in the trial of this cause.

10. The court erred in this: After granting a *subpœna duces tecum* to the clerk of Ashley county to produce the grand jury book of 1892, and after it had been produced, in permitting the prosecuting attorney to say that said book should not see the light of day in this court, and in not allowing defendant's counsel to see and examine the evidence of Sallie Hannibal reduced to writing in said book, and to prove her evidence by Ben Burgess.

11. The court erred in refusing to allow defendant to introduce the evidence of Sallie Hannibal, as contained in the grand jury book, for the purpose of contradicting her testimony, as taken before the examining court.

12. It was error to permit the state to prove by R. L. Cone what the verdict of the coroner's jury was.

13. It was error to permit the state to introduce what purported to be an affidavit made by D. L. Moore on a former trial, on motion for new trial for said cause.

14. The transcript filed in the Drew circuit court does not show that the court had jurisdiction.

15. The special judge had no power to open and adjourn court in the absence of the regular judge.

16. The court erred in refusing to permit D. L. Moore, J. P. Clark and others to testify as to what W. O. and B. L. Carpenter stated to them as to the manner of the killing and who did the shooting, etc.

17. It was error to allow the verdict to be amended by inserting the words "murder in the first degree."

18. The court erred in permitting the state's attorney to argue that if defendants, B. L. and W. O., formed a design previous to the homicide to go and kill Hannibal, and in pursuance of such design did go to the

premises of Hannibal for that purpose, then B. L. is guilty of murder in the first degree, although W. O. did all the shooting, if Ben L. was present consenting thereto and ready to assist.

*E. B. Kinsworthy*, Attorney General, for appellee.

1. The exceptions to the instructions are in mass, 54 Ark. 16. But, taking the instructions together, they contain no error. In order to justify on the ground of self-defense, it must appear that defendant, at the time he caused the death of deceased, was acting under a reasonable belief that he was in *imminent* danger of death or great bodily harm from deceased, and that it was necessary for him to strike the fatal blow in order to avoid death or great bodily harm, which was apparently imminent. Sand. & H. Dig., sec. 1676; 49 Ark. 543. If one is attempting to commit an *aggravated* felony upon either the person or property of another, he is justified in taking life; otherwise not. Sand. & H. Dig., sec. 1672. A man cannot set up self-defense until he has done everything reasonable in his power to prevent the killing. He cannot bring on a fight or difficulty, and then set up self-defense. 40 Ark. 459; 32 *id.* 585. The court's instructions as to reasonable doubt are the law. 29 Ark. 266. The 9th instruction given by the court is certainly the law. Sand. & H. Dig., sec. 1452; 42 Ark. 94.

2. There was no error in refusing appellants instructions. It was proper to strike out the word "threats" in the 1st. Sand. & H. Dig., sec. 1670; 2 Thompson on Trials, secs. 2160–2173. Threats alone, without any overt act or indication of intention to follow up the words with an assault, are not sufficient for the reasonable belief of imminent danger which is necessary to sustain the plea of self-defense. 77 Ala. 471; 36 Ark. 653; 62 Cal. 468. The 3rd, 4th, and 5th are abstract.

W. O. Carpenter was not on trial. One in defense of his property must not kill the aggressor, but must find redress in the courts. 1 Bish. Cr. L. sec. 875. The slayer must be without fault. Appellant was not on his premises—he was not defending his castle. He did not use every means to avoid the killing. He used the first opportunity to bring it on. 1 Bish. Cr. Law. secs. 844, 869; Clark, Cr. Law. pp. 144, 146, and authorities. The 6th, 7th, 8th, 9th, 10th and 11th are not law. When a dwelling is assailed with intent to take life, or inflict great bodily harm, the owner or occupant may lawfully use such fatal means to protect himself and family as may be necessary. He is not bound to retreat, but may kill his assailant, if it reasonably appear to be necessary for the protection of the dwelling; *but the killing of another to prevent a mere trespass upon property other than the habitation, and not to prevent a felony, is not justifiable or excusable.* Sand. & H. Dig., sec. 1670; 1 Bish. Cr. Law, sec. 875; 71 Ala. 329; 59 Ala. 1; 89 Mo. 667; 60 Cal. 2. These instructions are all too general and unqualified. 29 Ark. 267; 29 *id,* 226. Appellant's theory of the homicide was covered by the 1st and 2nd instructions given for appellant. When the court has covered the law, it is useless to multiply instructions on the same point. 34 Ark. 649.

3. The using the word "February" for "January" was a mere clerical error, in no wise prejudicial. He made no objections to the grand jury. Mere slight irregularities in selecting and impaneling the grand jury, where no substantial right of the accused is affected, do not affect the validity of the panel. 9 Am. & Eng. Enc. Law, p. 3, note 17. These irregularities are waived by plea to the indictment. 29 Ark. 165; 42 *id.* 94; 40 *id.* 488.

4. No foundation was laid for the impeachment of Mrs. Hannibal. 37 Ark. 324. Contradictory statements

cannot be used to impeach a witness after death has placed him beyond the power of explaining. 29 Am. & Eng. Enc. Law, p. 788.

5. The writs of certiorari cure all defects in jurisdiction charged by appellant.

6. The statements of the Carpenters to Moore and others, long after the killing, were no part of the *res gestæ.* 3 Rice on Ev., sec. 80; 50 Ark. 397; 61 Ark. 52.

7. The record does not bear out appellant's objections as to the amendment of the verdict, or the remarks of the counsel for the state.

*Robert E. Craig,* for appellant in reply.

1. Defendant's theory was that he and W. O. armed themselves, and went to repair the fence of W. O., and, while on his *own premises* repairing his fence, *which was a lawful act,* deceased, seeing him there, left his house, crossed the public road, and went to where he was, and attempted to drive him away, drew his pistol, and attempted to shot W. O.; that W. O. or appellant shot and killed deceased to save the life of W. O. from imminent, pressing, and urgent danger, and that it made no difference which fired the fatal shot; both or either were justifiable. There was conflict of evidence, and this theory should have been presented to the jury under proper instructions. 29 Ark. 248; 47 *id.* 196; 50 *id.* 545; 52 *id.* 45; 58 *id.* 241; 8 Cal. 341; 19 S. W. 975.

2. It was impossible to lay any foundation to impeach Mrs. Hannibal. She was dead. Sand. & H. Dig., secs. 2959–60, are taken from the common law. Gr. Ev., vol. 1, 461–2–3. The rule is confined solely to cross-examination. It was error to refuse Burgess' testimony. Sand. & H. Dig., secs. 2042–3, 2054, 2055.

3. There was no such term as the "February" term, and the action of the commissioners was a nullity. 21 Ark. 200; Sand. & H. Dig., secs. 4265 to 4272, 4280, 4284, 4291; 58 Ark. 37.

BATTLE, J.   Ben L. Carpenter was indicted in the
Ashley circuit court for murder in the first degree; was
tried, after a change of venue, in Drew county; and was
convicted of the crime of which he was accused.   He
now brings the record of his trial and conviction to this
court, and asks for a reversal of the judgment against
him, and for a new trial.

The indictment was filed in open court by the grand
jury on the 19th of January, 1892.   The defendant was tried
and convicted in August, 1893.   The judgment of convic-
tion was reversed by this court on appeal [58 Ark. 233], and
the cause was remanded for a new trial.   After this, on the
24th of September, 1895, the defendant filed a motion to
set aside the indictment because the commissioners who
selected the grand and alternate grand jurors for the
January term, 1892, of the Ashley circuit court (at
which term this indictment was filed), stated in their
indorsement on the same that the lists were for the
February term, 1892, when they should have said that
they were for the January term, 1892.   The motion was
denied.

On the 24th of September, 1895, the defendant filed
a plea in which he alleged that, in a former trial of the
issues in this prosecution, he had been convicted by a
jury of the charge alleged in the indictment, but they
failed to specify the degree of homicide of which they
found him guilty in their verdict, and that a judgment
was rendered upon this verdict, which judgment was
afterwards reversed by this court on appeal, and a new
trial was granted, and that, therefore, he had been put
in jeopardy for the same offense charged in the indict-
ment, and should be discharged.   The trial court held
that the plea was insufficient.

On the 26th of September, 1895, he filed a motion for
a continuance, in which he alleged that he could not
safely go to trial, because of the absence of James Coulter

and Lee Turner, and that he expected to prove by Coulter that he was at the place of killing on the evening it occurred, and saw a pistol lying on the mantel, which pistol Hugh Estelle said Hannibal had when he was killed; and that he expected to prove by Turner that he had examined the gun which the defendant had on the day of the homicide; that it was an old, muzzle-loading gun; that it had been loaded a long time; that he tried and could not "discharge" it, and "drew the load with a gun wiper." The motion was denied.

The court thereupon proceeded with the trial of the defendant for the offense charged against him in the indictment.

The facts, as stated by witnesses in the trial, are substantially as follows: W. O. Carpenter, the brother of appellant, rented a field on Pine Prairie, in Ashley county, in this state, for the year 1891, and planted it in peas and corn. H. L. Hannibal lived near this field, and had adjoining it a small cow pen. After the crop of corn had matured and was gathered, W. O. Carpenter saw Hugh Estelle, a boy who was living with Hannibal, bringing some stock out of the field. Carpenter remonstrated with him, and requested him to tell Hannibal not to put his stock in there again. He also discovered that a gap leading from the cow pen into the field had been made by Estelle and Hannibal for stock to pass in and out. He closed the gap, and then put his own mules in the field. This was on Saturday morning, September 26, 1891.

On Sunday morning following, W. O. Carpenter, going into the field, discovered that the gap had been reopened. One story is that he called Hannibal, who was then sitting on the gallery of the house near by, to him, and remonstrated with him in reference to the gap and putting his stock in the field, and that an angry altercation ensued, and Hannibal, going into the field

where Carpenter was, refused to permit him to repair the fence, cursed him, and drove him away. Another story is that Carpenter went to Hannibal's house, and cursed him, and said that he did not want him to put his mules in the field any more; if he did, he would kill him; and that Hannibal offered to pay damages, and Carpenter refused to accept them; and that Hannibal was sitting on the fence while this conversation continued.

On the same morning, after seeing Hannibal, he visited his brother, Ben L. Carpenter, and a justice of the peace, and asked the latter what he should do for the protection of his property. The justice informed him that a renter had the right to the possession of the rented land for the full period of his lease, and said, "If it was my field, I would put up the gap, at all hazards." He then went to T. J. Wells, and got a pistol; and then to John Wheat's, and borrowed a breech-loading double-barreled shotgun, and three or four brass shells, from him. He then returned home, ate his supper, and then returned to his brother Ben's. About ten o'clock in the night following, some one went to the house of Wilson Hunnicutt, and borrowed of him eighteen buckshot and a headlight, and said he "wanted to go a fire-hunting." Hunnicutt says that he knew him well, and that he was Ben L. Carpenter, but W. O. and Ben L. Carpenter swear that it was W. O. Carpenter.

Jesse George testified as follows: "I saw Ben Carpenter at his house Sunday morning after Ol. Carpenter (W. O. Carpenter) had been there. He told me that he would rather Ol. would get somebody else to go with him down to Hannibal's, for if Hannibal hurt or killed Ol. he would have to kill Hannibal; that Ol. would be so slow he would have to kill Hannibal."

On Monday morning following (the 28th of September, 1891), B. L. Carpenter went to W. O. Carpenter's,

carrying with him a double barreled shotgun, and ate breakfast. After breakfast, early in the morning, the two brothers (Ben with his gun, and W. O. with a shotgun and pistol) went to the field on Pine Prairie which W. O. Carpenter had rented, as before stated, and which was near to the residence of W. O. Carpenter. When they entered the field, W. O. went to the gap. About this time, Hannibal came out of the door of his house with a bucket, intending to draw water from a well about 100 yards distant. Seeing W. O. at the gap, he handed the bucket to the boy, Hugh Estelle, and went back into the house. One story was, he came out again with something in his hand which looked like a pistol; that he immediately went to the gap to prevent Carpenter from repairing the fence; that Carpenter expressed a determination to repair it, and, as he did so, Hannibal threatened to kill him, and turned his back, and exhibited a pistol in his hip pocket, and moved his hand as if he would draw it, when W. O. Carpenter shot him; that Hannibal attempted to shoot, and W. O. Carpenter shot again, killing him; and that Ben L. Carpenter was 25 or 30 yards distant from the gap, and took no part in the shooting.

Another story told by the witnesses for the state was that, when the deceased saw W. O. Carpenter at the gap, he went back to the door, and pushed it open, and without entering, said to his wife that he was going out there and tell Carpenter not to put up the fence, that he would put it up after breakfast; that he went to the gap, but carried with him no weapon, not even a pocket knife; that he had a pistol, but left that in the house; that he was standing with his left hand on a little tree by the fence talking to W. O. Carpenter, when Ben L. Carpenter, who was standing near by, shot him in the left side with a shotgun, when he turned around, and Ben L. shot him the second time with the same gun; that

the deceased fell, and W. O. Carpenter then shot him twice in the face with a pistol; and that the Carpenters then ran off, yelling.

Immediately after the killing a pistol was found on the ground near the deceased, but witnesses for the state testified that the pistol was at the time of the shooting on the mantel piece in the house of the deceased; that when the gun was fired, the wife of the deceased ran back, got it, and carried it to where he was, and, seeing him lying on the ground dead, threw it down.

A witness in behalf of the defendant testified that, on the Sunday preceding the killing, the deceased endeavored to borrow a Winchester rifle, and to procure cartridges, and expressed the purpose to put his stock in Carpenter's field, or kill him.

In the progress of the trial the testimony of Mrs. Sallie Hannibal, the widow of the deceased, taken and reduced to writing before an examining court, was read as evidence in behalf of the state, she being dead at the time of the trial. In that testimony she stated that she did not see Ben L. Carpenter until he shot, when he was about ten feet above the gap, close to the fence. Afterwards she testified before a grand jury as to the same matter. A member of this jury, Ben Burgess, was introduced as a witness in behalf of the defendant, and was asked the following questions: "Were you a member of the grand jury that indicted defendant? If so, did you hear Sallie Hannibal testify before that body? If so, what did she say as to where Ben L. Carpenter stood at the time the shooting was done?" And the court refused to allow him to answer them. But he was permitted to testify that she said, on the day of the killing, that Ben shot the deceased with a shotgun while he was leaning on the fence at the gap, and that Ben was about fifteen feet east of the gap. Another witness was allowed to testify that she said

that "she was in bed when the first gun fired; and just as she was putting her dress over her head, the second gun fired, and as she went on the gallery the pistol fired," and that she said in this connection that "Ben Carpenter (defendant) hollowed out in the field." And the court gave the defendant permission to read, as evidence, the testimony of Mrs. Hannibal before the grand jury which returned the indictment against the defendant, as written by its clerk, which testimony so written was then in court, and he refused to read it. To the refusal of the court to permit Burgess to answer the questions propounded to him, the defendant excepted, and made it one of his causes for a new trial.

The following instructions were given to the jury by the court on its motion:

"First: The court instructs the jury that murder is the unlawful killing of a human being in the peace of the state, with malice aforethought, either express or implied.

"Second. The manner of the killing is not material, further than it may show the disposition of mind, or the intent, with which the act was committed.

"Third. Express malice is that deliberate intention of mind unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

"Fourth. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing manifest an abandoned and wicked disposition.

"Fifth. You are instructed that justifiable homicide is the killing of a human being in necessary self-defense, or in defense of habitation, person, or property, against one who manifestly intends or endeavors by violence or surprise to commit a known felony; and if you believe from the evidence that the defendant shot

deceased twice with a shotgun, and that said shots killed deceased, while deceased was standing talking to his brother, and not to save his own life, or to protect his person from receiving great bodily harm, nor in defense of his habitation, person, or property, you will find defendant guilty of murder, as charged in the indictment.

"Sixth.    All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate, malicious, and premeditated killing, or which shall be committed in the perpetration of, or in the attempt to perpetrate, arson, rape, robbery, burglary, or larceny, shall be murder in the first degree. All other murder shall be deemed murder in the second degree.

"Seventh.    The jury are the sole judges of the evidence and the credibility of the witnesses.    In determining as to the weight that should be given to the testimony of any witness, they may take into consideration his manner of testifying, his means of information, his interest, if any, in the cause pending, his prejudices, and his motives; and if from these you should believe that any witness has sworn falsely, wilfully, to any material fact, you may disregard the whole or any part of the evidence of such witness.

"Eighth.    The court instructs the jury that a reasonable doubt is not a captious, imaginary, or possible doubt, but must be such a doubt as a reasonable man would have in matters of deepest concern to himself, and must arise out of the evidence in the cause.

"Ninth.    You are instructed that if you believe from the evidence that the defendant was present and participated in the killing of H. J. Hannibal, by shooting him with a shotgun, as charged in the indictment, and that said shooting was done in furtherance of a previous design and understanding between himself and his

brother to kill said Hannibal, and that, as a result of such design and understanding, H. J. Hannibal was killed, you will find him guilty, although it may not be shown that the shot or shots fired by defendant, if any were shot by him, actually caused the death of the deceased.

"Tenth.     Manslaughter is the unlawful killing of a human being without malice, expressed or implied, and without deliberation.    Manslaughter must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible."

To the giving of the fifth, eighth, and ninth of which the defendant at the time excepted.

And the defendant requested, and the court gave, the following instructions:

"First.     The jury are instructed that justifiable homicide is the killing of a human being in necessary self-defense, or in defense of habitation, person, or property, against one who manifestly intends or endeavors, by violence or surprise, to commit a known felony; and, if the killing in this case is shown by the evidence to be justifiable or excusable, the defendant shall be acquitted and discharged.

"Second.     A felony is a crime punishable by death or imprisonment in the state penitentiary; and, if the jury believe from the evidence that Hannibal attempted, by force, to drive W. O. Carpenter from his field, and if, in so doing, drew a pistol with intent to shoot, and attempted to shoot and kill W. O. Carpenter, this was a felony on the part of Hannibal.

"Twelfth.     The jury are instructed that it is incumbent on the state to prove every material allegation contained in the indictment, beyond a reasonable doubt, and it is a material allegation that Ben L. Carpenter shot and killed the deceased with a shotgun; and if, from all the evidence, you have a reasonable doubt whether or not Ben L. Carpenter shot and killed the

deceased with a shotgun, and if, from all·the evidence, you have a reasonable doubt whether or not Ben L. Carpenter shot and killed Hannibal with a shotgun, or whether he came to his death by shots fired by W. O. Carpenter, then the defendant is entitled to the benefit of such doubt, and you will acquit him.

"Thirteenth.    The jury are instructed that if, upon the whole of the evidence in the case, they have a reasonable doubt as to the guilt or innocence of the defendant, they will give the defendant the benefit of the doubt, and acquit him."

And the defendant asked, and the court·refused to give, the following :

"Third.    If the jury believe from the evidence that W. O. Carpenter had rented the pasture field for the year 1891, then for the whole of that year the field was the property of W. O. Carpenter, and for that time he might lawfully protect the same as fully as if he owned it in fee simple.

"Fourth.    If the jury believe that W. O. Carpenter, being in the lawful possession of the pasture field, had reasonable grounds to believe that it was necessary to kill Hannibal to protect himself from great bodily harm at the hands of Hannibal, and if, acting under such belief, he shot and killed him, then he was justifiable.

"Fifth.    The jury are instructed that a person on his own premises is not bound to retreat, but has the right to use such force as is reasonably necessary to repel a forcible entry thereon.

"Sixth.    If the jury believe that W. O. Carpenter was on his own premises, and that Hannibal threatened him, while he was putting up his fence, to kill him if he did so, and that he had at the time reasonable grounds to believe, and did believe, that Hannibal intended to take his life, or do him great bodily harm, then he was not

obliged to retreat, nor consider whether he could safely
retreat, but was entitled to stand his ground, and meet
any attack made on him with a deadly weapon; and if,
under all the circumstances, he, at the moment, believed,
and had reasonable grounds to believe, that it was neces-
sary to save his own life, or to protect himself from
great bodily injury, he had the right to kill Hannibal.

"Seventh.   If you believe that Hannibal had made
slip gaps in W. O. Carpenter's fence, and on Sunday
before the killing, Hannibal, by his manner, threats, and
acts, led W. O. Carpenter to believe that he intended
forcibly to take, hold, and use his pasture against his will,
and forcibly to prevent him from repairing his fence,
then he had the right to prepare himself and hold his
property against any violence which might be offered;
and if you further believe from the evidence that, on the
morning of the killing, W. O. Carpenter armed himself
with a shotgun and pistol, and the defendant, Ben L.
Carpenter, armed himself with a shotgun, and they
together went to repair W. O. Carpenter's fence, and
Hannibal, seeing W. O. Carpenter repairing his fence,
armed himself with a pistol, and went to where Carpen-
ter was repairing the fence, to forcibly prevent him from
doing so, and made such overt acts that, from his man-
ner, threats, and words, the defendant, Ben L. Carpen-
ter, had reasonable grounds to believe that W. O. Car-
penter was in immediate danger of death or great bodily
harm at the hands of Hannibal, and W. O. Carpenter, or
the defendant, Ben L., one or both, shot and killed
Hannibal to avert such impending danger, then defendant
was justifiable, and you will acquit him; and if you have
a reasonable doubt on this proposition, you will give the
defendant the benefit of the doubt, and acquit him.

"Eighth.   If the jury believe that W. O. Carpen-
ter had the right to go to his field for the purpose of
putting up a gap in his fence, and that he had a right to

arm himself for the purpose of protecting himself from violence at the hands of Hannibal while so repairing it, then you are instructed that defendant, Ben L. Carpenter, also had a legal right to arm himself, and go with his brother to the pasture field, for the purpose of protecting his brother from death or great bodily harm at the hands of Hannibal, while so repairing the fence.

"Ninth. The jury are instructed that W. O. Carpenter had the legal right to arm himself, and defend his property against a forcible trespass. The defendant, B. L. Carpenter, had the legal right to arm himself, go with his brother, and, if necessary, assist him against such forcible trespass; and if you believe from the evidence that the two brothers armed themselves, and went to repair W. O. Carpenter's fence, and that he shot and killed Hannibal in resisting a forcible trespass made by Hannibal, then defendant, Ben L. Carpenter, is no wise responsible for said killing; and if you have a reasonable doubt upon this question, you will give the defendant the benefit of such doubt, and acquit him.

"Tenth. If the jury believe that Hannibal was a violent and dangerous man, then, in considering the guilt or innocence of defendant, they may take such bad character as a circumstance tending to show who was the aggressor in the encounter which resulted in the death of Hannibal.

"Eleventh. If the jury have a reasonable doubt, from all the evidence in the whole case, whether or not W. O. Carpenter, at the time of the killing (if you believe from the evidence that W. O. Carpenter did all the shooting), had reasonable grounds to believe, and did believe, that he was in danger of death or great bodily harm at the hands of Hannibal, then the defendant, Ben L. Carpenter, is entitled to the benefit of the doubt, and you will acquit him."

In addition to what we have stated, other grounds for setting aside the verdict were stated in a motion for a new trial, which do not appear elsewhere in the record, and consequently will not be noticed in this opinion.

First.    The trial court committed no error in refusing to set aside the indictment against appellant on account of the formation of the grand jury which found it.

As to formation of grand jury.

The statutes of this state require circuit courts to appoint three commissioners, at every term, to select grand jurors to serve at the term next succeeding their selection, and make it their duty to enclose and seal a list of the jurors so selected, and indorse it "List of Grand Jurors," designating for what term of the court they are to serve, and deliver the same to the judge in open court.   The judge is then required to place it in the custody of the clerk (after administering to him and his deputies certain oaths), whose duty it is then made to keep the same enclosed and sealed until thirty days before the next term, and then make out a fair copy of it, and deliver it (the copy) to the sheriff, or his deputy, who is then required to summon the persons named therein to attend on the first day of said term for the purpose of serving as grand jurors.   In compliance with these statutes, three commissioners were appointed by the Ashley circuit court, at its August term in 1891, to select grand jurors to serve at its next term, which was to commence on the third Monday in January following.   They selected them, and made a list of their names, and indorsed it as the list of grand jurors selected for the February term, 1892, when there was no such term.   The persons selected were summoned to attend the court on the first day of its January term, and were present on that day, and sixteen of them were selected, impaneled, and sworn as grand jurors for that

term. There was no error in this proceeding. They were unquestionably selected to serve at the term succeeding their selection. The designating that term as the February, instead of the January, term was an obvious mistake. The intention was apparent and unmistakable.

When objection to grand jury waived.

If there had been any error in the impaneling the grand jury, the appellant was too late in taking advantage of it. He had waived it by pleading to the indictment. *Dixon* v. *State*, 29 Ark. 165; *Wright* v. *State*, 42 *id*. 94; *Straughan* v. *State*, 16 *id*. 41; *Miller* v. *State*, 40 *id*. 488.

Sufficiency of plea of former conviction.

Second. The plea of former jeopardy was properly overruled. The jury found the appellant guilty as charged in the indictment. There was no intention to acquit. But the verdict of the jury was defective because it failed to state the degree of unlawful homicide of which the appellant was found guilty. No legal judgment could be rendered upon it. Neither party sought to have the jury so amend it as to make it specify the degree of homicide. A judgment of death was rendered on it against the defendant, and he appealed, and the judgment was reversed, and the cause was remanded for a new trial. Under these circumstances, the former trial and conviction are no bar to a second trial on the same indictment. *Johnson* v. *State*, 29 Ark. 31; *Allen* v. *State*, 26 Ark. 333; *State* v. *Redman*, 17 Iowa, 329; *Turner* v. *State*, 40 Ala. 21; *Waller* v. *State*, *id*. 325; *Kendall* v. *State*, 65 Ala. 492; 1 Bishop, New Cr. L., sec. 998, and cases cited.

Denial of continuance not error.

Third. The denial of the continuance that was asked for by appellant was not prejudicial. What he expected to prove by James Coulter was sworn to by as many as two witnesses in behalf of the state, and three witnesses testified to what he expected to prove by Lee Turner, which was not contradicted.

Fourth.   We do not think that the court erred in refusing to allow Ben Burgess to testify as to what Mrs. Hannibal said in her testimony before the grand jury as to the place where appellant "stood at the time the shooting was done." No foundation was laid for it by asking Mrs. Hannibal, when she testified, as to whether she had ever made such statements. *Griffith* v. *State*, 37 Ark. 324; *Ayers* v. *Watson*, 132 U. S. 394; *Mattox* v. *U. S.*, 156 U. S., 237.  If the evidence was competent, no prejudicial error was committed in the refusal to admit it. She was contradicted in that respect by her own statements to different persons, as shown by the testimony of the witnesses; and the court gave appellant permission to read her testimony before the grand jury, as taken down by its clerk, for the purpose of impeachment, and, without giving any reason for refusing to accept the offer, he failed or refused to read it as evidence. We do not see that he has any room to complain of the refusal of the court to admit the testimony of Burgess.

Fifth.   The determination of the questions pre- sented by the instructions given and refused by the court involves, to some extent, a consideration of the following sections of Sandels & Hill's Digest:

"Section 1670.   Justifiable homicide is the killing of a human being in necessary self-defense; or in defense of habitation, person or property, against one who manifestly intends, or endeavors, by violence or surprise, to commit a felony.

"Sec. 1671.   If the homicide with which any person shall be charged shall appear upon the trial to be justifiable or excusable, such person shall be fully acquitted and discharged.

"Sec. 1672.   An attempt to commit murder, rape, robbery, burglary, or any other aggravated felony, although not herein specifically named, upon either the

person or property of any person shall be justification of homicide.

"Sec. 1676. In ordinary cases of one person killing another in self-defense, it must appear that the danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily injury, the killing of the other was necessary, and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further contest before the mortal blow or injury was given."

These statutes, so far as they extend, are a re-enactment of the common law. They make homicides in self-defense excusable, and justify those committed by the slayer in defense of "person, habitation, or property, against one who manifestly intends and endeavors, by violence or surprise, to commit a known felony, such as murder, robbery, arson, burglary, and the like, upon either," as at common law. As construed by this court, they uphold, protect, and enforce the right to slay an assailant in self-defense, to the same extent it existed at the time of their enactment. To construe them properly, it is necessary to ascertain what the common law upon the same subject was at the time they took effect.

At common law, and under the statutes of this state, no one, in resisting an assault made upon him in the course of a sudden brawl or quarrel, or upon a sudden rencounter, or in a combat on a sudden quarrel, or from anger suddenly aroused at the time it is made, or in a mutual combat, is justified or excused in taking the life of the assailant, unless he is so endangered by such assault as to make it necessary to kill the assailant to save his own life, or to prevent a great bodily injury, and he employed all the means in his power, consistent with his safety, to avoid the danger and avert the necessity of killing. He cannot provoke an attack, bring on

the combat, and then slay his assailant, and claim exemption from the consequences of killing his adversary, on the ground of self-defense. He cannot invite or voluntarily bring upon himself an attack with the view of resisting it, and, when he has done so, slay his assailant, and then shield himself on the assumption that he was defending himself. He cannot take advantage of a necessity produced by his own unlawful or wrongful act. After having provoked or invited the attack, or brought on the combat, he cannot be excused or justified in killing his assailant for the purpose of saving his own life, or preventing a great bodily injury, until he has in good faith withdrawn from the combat, as far as he can, and done all in his power to avoid the danger and avert the necessity of killing. If he has done so, and the other pursues him, and the taking of life becomes necessary to save life or prevent a great bodily injury, he is excusable. *Palmore* v. *State*, 29 Ark. 248; *McPherson* v. *State*, 29 Ark. 225; *Levells* v. *State*, 32 Ark. 585; *Stanton* v. *State*, 13 Ark. 317; *Dolan* v. *State*, 40 Ark. 454; *Fitzpatrick* v. *State*, 37 Ark. 238; *Duncan* v. *State*, 49 Ark. 543; *Johnson* v. *State*, 58 Ark. 57; *Smith* v. *State*, 59 Ark. 132.

But the rule is different where a man is assaulted with a murderous intent. He is then under no obligation to retreat, but may stand his ground, and, if need be, kill his adversary.

In East's Pleas of the Crown, the author says: "A man may repel force by force in defense of his person, habitation, or property, against one who manifestly intends and endeavors, by violence or surprise, to commit a known felony, such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger, and if he killed him in so doing it is called justifiable

self-defense; as, on the other hand, the killing by such felon of any person so lawfully defending himself will be murder. But a bare fear of any of these offenses, however well grounded, as that another lies in wait to take away the party's life, unaccompanied with any overt act indicative of such an intention, will not warrant him in killing that other by way of prevention. There must be an actual danger at the time." 1 East's Pleas of the Crown, p. 271. See, to the same effect, 4 Blackstone's Com., p. 180; Foster's Crown Law, p. 273; and 1 Bishop's New Cr. Law, sec. 850.

According to the common law, it is the duty of every one, seeing any felony attempted, by force to prevent it, if need be, by the extinguishment of the felon's existence. This is a public duty, and the discharge of it is regarded as promotive of justice. Any one who fails to discharge it is guilty of an indictable misdemeanor, called misprision of felony. And, as a result of this doctrine, Mr. Bishop says: "If a man murderously attacked by another flies instead of resisting, he commits substantially this offense of misprision of felony; even though we should admit that in strict law he will be excused, because acting from the commendable motive of saving life." 1 Bishop, New Criminal Law, sec. 851-849; *Pond* v. *People*, 8 Mich. 150. See, also, *Bostic* v. *State*, 94 Ala. 45; *Weaver* v. *State*, 53 Am. Rep. 389; *Gray* v. *Combs*, 7 J. J. Marsh. 478; 4 Blackstone's Com. 180; 1 Hale's P. C. 480; Clark's Cr. Law, 137; 1 Wharton's Cr. L. (10 Ed.), sec. 495.

It is evident, therefore, that sections 1670 and 1672 of Sandels & Hill's Digest are enactments of no new laws, but are an affirmance of the common law then in force. They declare no new right or duty, and provide that only homicides committed in the exercise or discharge of the common law right or duty to defend the habitation, person, or property against one who mani-

festly intends or endeavors, by violence or surprise, to commit a known felony, or to prevent attempted felonies, such as murder, rape, robbery, burglary, or other aggravated felony, shall be justifiable, and leave the common law as to the extent, the circumstances, and the manner in or under which the right or duty may be exercised or discharged, still in force.

It follows, then, that any one, under the laws of this state, may repel force by force in defense of person, habitation, or property against any one who manifestly intends and endeavors by violence or surprise to commit a known felony upon either; and that he need not retreat, in such cases, but may stand his ground, and, if need be, kill his adversary. It is also true that any person, for the prevention of murder, rape, robbery, burglary, or any other aggravated felony, may, under our statutes, if necessary, kill another attempting to perpetrate such felonies. But these rights are not without limitations. "A bare fear," says the statute, "of those offences, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under their influence, and not in a spirit of revenge." (Sec. 1675). The circumstances must be such as to impress the mind of the slayer, without fault or carelessness on his part, with the reasonable belief that the necessity for killing to prevent the felony was immediate and impending, and the danger imminent. Knowing the other's design, the slayer had no right to seek a conflict, but must wait until the other does something at the time indicating a present intention of carrying his design into effect. While the slayer can stand his ground, and refuse to retreat, he should do what he can to avoid the necessity of killing, and at the same time exercise this right, and

prevent the threatened felony. In no case will he be justified in taking the life of the aggressor, when, by arresting or disabling him, or otherwise, he can prevent the felony, or when the danger, in the reasonable belief of the assailed, has ceased to be immediate and impending. There must be an immediate necessity for the killing, for the statute says, "Every person who shall unnecessarily kill another while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt has failed, shall be guilty of murder or manslaughter, according to circumstances," Sec. 1649. See *Pond* v. *People*, 8 Mich. 150; 1 East, P. C. 272; 1 Wharton, Cr. Law, (9th Ed.), secs. 495–501, and cases cited; 1 Bishop's New Cr. Law, secs. 843, 846, 869, and cases cited.

But the right to defend property against one who manifestly intends or endeavors, by violence or surprise, to commit a known felony, to the extent of slaying the aggressor, does not include the right to defend it, to the same extent, where there is no intention to commit a felony. A man may use force to defend his real or personal property in his actual possession against one who endeavors to dispossess him without right, taking care that the force used does not exceed what reasonably appears to be necessary for the purpose of defense and prevention. But, in the absence of an attempt to commit a felony, he cannot defend his property, except his habitation, to the extent of killing the aggressor for the purpose of preventing a trespass; and if he should do so, he would be guilty of a felonious homicide. Life is too valuable to be sacrificed solely for the protection of property. Rather than slay the aggressor to prevent a mere trespass, when no felony is attempted, he should yield, and appeal to the courts for redress. Ordinarily, the killing allowed in the defense of property is solely for the prevention of a felony. "If," as Clark on Crimi-

nal Law says, "a man attacks me, and tries to take my
property by force, he attempts a robbery, and I may kill
him to prevent the felony. The justification does not
rest on my right to defend my property. If a man
attempts to set fire to my dwelling house by surprise,
and I can only prevent it by killing him, I may do so; but
the reason is because I may and must prevent the felony,
and not because, if I do not kill him, I will lose my
property. If the house were uninhabited, and therefore
not the subject of arson (at common law), I would have
no right to kill him, though my loss of property would
be as great." *People* v. *Flanagan*, 60 Cal. 2; *State* v.
*Vance*, 17 Iowa, 138; *Davison* v. *People*, 90 Ill. 221; 1
Bishop's New Crim. Law, secs. 857, 861, 875; Clark on
Cr. Law, p. 144.

Tested by what we have stated the law to be, did
the trial court commit any reversible error in giving or
refusing instructions to the jury?

There is no reversible error in the instruction given
by the court on its own motion, numbered "fifth," and
objected to by the appellant. The jury could not have
found him guilty under that instruction, except upon a
state of facts, which, if true, proved him guilty of a
deliberate murder. If they convicted him under it, they
found him guilty of deliberately killing the deceased
while he was standing talking to the brother of appel-
lant, and making no effort to do violence to any one.

The eighth instruction given by the court on its own <span style="float:right">Instruction<br>as to reason-</span>
motion, and objected to by the appellant, was a definition <span style="float:right">able doubt<br>approved.</span>
of a reasonable doubt, and, while it is not as full and
complete as it might be, contains no reversible error.

The ninth instruction given by the court on its own <span style="float:right">As to a<br>conspiracy.</span>
motion, and objected to by the appellant, was obviously
given to modify the instruction given at the request of
the appellant, and numbered "twelfth," in which the
court told the jury that if they had "a reasonable doubt

whether or not Ben L. Carpenter shot and killed Hannibal with a shotgun, or whether he came to his death by shots fired by W. O. Carpenter," then the defendant was entitled to the benefit of such doubt, and to acquit him. In the ninth they were told that if "defendant was present and participated in the killing of H. J. Hannibal, by shooting him with a shotgun, as charged in the indictment, and that said shooting was done in furtherance of a previous design and understanding between himself and his brother to kill said Hannibal, and that, as a result of such design and understanding, H. J. Hannibal was killed, you will find him guilty, although it may not be shown that the shot or shots fired by defendant, if any were shot by him, actually caused the death of the deceased." Taking this in connection with the instructions defining justifiable homicide and the different degrees of unlawful homicide, and the verdict of the jury finding him guilty of murder in the first degree, we see no reason to conclude that it was misleading or prejudicial.

As to the right to resist a trespass.

So much of the instructions asked by the appellant and refused by the court, and numbered third, fourth, fifth, sixth, seventh, eighth, and ninth, as is applicable to appellant, was based on the theory that W. O. Carpenter, being in the possession of his field, had the right to resist a trespass upon the same by Hannibal to the extent of taking his life, and that his brother, the appellant, could lawfully assist him in such resistance, and were properly refused.

Instruction should not single out evidence.

The instruction numbered "tenth," which the appellant asked and the court refused to give, was as to the effect the jury might give to the bad character of the deceased. It was not within the province of the court to select one fact, and tell or suggest to the jury what effect they might give to it. The jury should consider all the

evidence, and base their verdict upon their conclusions from it as a whole. The prayer was properly denied.

The first half of the other instruction which was refused was covered by instructions given, and the other half, as to self-defense, was incorrect.

Sixth. There was sufficient evidence to sustain the verdict of the jury. While the conviction of murder in the first degree is not entirely satisfactory, we are without authority to interfere with it.

Judgment affirmed.

Wood, J., did not sit in this case.