COMMONWEALTH *vs.* JOAQUIN LOPES.

Plymouth. May 7, 1945. — June 28, 1945.

Present: FIELD, C.J., LUMMUS, QUA, RONAN, & WILKINS, JJ.

*Misprision of Felony. Conspiracy.*

Review by LUMMUS, J., of authorities relating to misprision of felony.

If the crime of misprision of felony exists in this Commonwealth, it is not established unless an evil motive to prevent or delay the administration of justice is shown.

A conviction on a charge of conspiracy to impede and obstruct the administration of justice by withholding knowledge of the whereabouts of a certain person who, the defendant knew, had disappeared and was being widely sought and who afterwards was found to have been murdered, was not warranted where the evidence showed merely that, although the defendant had discovered the body of the person named and had agreed with a companion then present with him to keep silent respecting the discovery, his failure to communicate the discovery was motivated by fear of exposure of a criminal purpose, wholly unconnected with the body or its discovery, which had occasioned his going to the place of discovery with his companion.

INDICTMENT, found and returned on October 5, 1944.

The case was tried in the Superior Court before *Cabot,* J.

*J. B. Mahar,* (*A. de J. Cardozo* with him,) for the defendant.

*E. R. Dewing,* District Attorney, (*J. L. Rabb,* Assistant District Attorney, with him,) for the Commonwealth.

LUMMUS, J. The first count of the indictment in this

case charged that the defendant and one Bertha Pina, who were jointly indicted, "knowingly and wilfully intending to conceal and suppress information relating to the alleged murder of one Frances McGrath, did conspire together to impede and obstruct the administration of justice by withholding to themselves knowledge of the whereabouts of said Frances McGrath, well knowing that said Frances McGrath had not been located and that law enforcement officers were then engaged in a search for the said Frances McGrath and for evidence relating to the disappearance of said Frances McGrath."

Both defendants were found guilty on both counts of the indictment. The defendant Lopes was sentenced to imprisonment for six months in the house of correction under G. L. (Ter. Ed.) c. 279, § 5, and brings his case here by exceptions.

Conspiracy to commit a crime is itself a misdemeanor at common law. *Commonwealth* v. *Hunt,* 4 Met. 111, 121–123. *Fox* v. *Commonwealth,* 264 Mass. 51, 53. *Commonwealth* v. *Pelletier,* 264 Mass. 221, 227. The decisive question in this case is whether either of the defendants alleged to have conspired would have been guilty of crime by withholding information of what had happened to the Frances McGrath named in the indictment. The question is raised by a motion for a directed verdict in favor of the defendant, which was denied subject to his exception.

There was evidence tending to prove the following facts. On June 10, 1944, a child of ten named Frances McGrath was reported to the police as missing from her home in Scituate. A widespread search resulted, in which police, firemen, the Coast Guard, the Massachusetts State Guard, the United States Army, and many volunteers took part. The search was given great publicity throughout eastern Massachusetts, by newspaper and by radio. Whether the child was alive, or had died of accident or exposure, or had been murdered, was not known. It was not until June 16 that the dead body of the child was found in a sparsely settled wooded area near Winter Street in Norwell. The defendant Lopes led police to the body.

Both the defendant and Bertha Pina knew of the search for the missing child. Both were married, but not to each other. Secretly she had been his mistress for two years. On June 13 both were riding in the defendant's truck, and drove into the woods for the purpose of committing adultery. As the truck stopped, the defendant called the attention of his companion to the body of a child lying on the ground. It does not appear that they examined the body, or knew what had happened to the child. Both were frightened, and wished to flee from the place. Bertha Pina said to the defendant, "What shall we do? I don't want to go to the police, I am married." He replied, "I will keep it quiet. This is between us and God." They then went to their several homes.

The defendant had sufficient public spirit to wish to assist the police in recovering the body, but did not wish to injure Bertha Pina or himself by disclosing their relations. Accordingly, he went to the police on the morning of June 16, and told them that he had found the body on that morning while going into the bushes "to relieve himself." The defendant told the police that his attention was directed to the body by its strong odor. There was testimony, however, that the body when found had no odor. There was medical testimony that the child had been raped, but probably was alive on June 13. The defendant adhered to his story until July 17, when he confessed to something like the facts hereinbefore stated.

We may disregard the second count of the indictment, which added to the same charge already quoted from the first count the words "and in pursuance of said conspiracy did agree to make false statements to the law enforcement officers, to the interference and obstruction of the due course of justice." There is no evidence that Bertha Pina participated in any plan to make false statements. The only plan known to her was a plan to keep silent. The defendant could not conspire alone. For this reason a conviction would not have been warranted upon the second count. It is at least doubtful whether the motion for a directed verdict required consideration of the evidence as

to each count taken by itself. But though the motion be treated as a general one directed to the indictment as a whole, it should have been granted unless there was evidence warranting a conviction upon the first count.

It may be conceded that by the common law of England every man was bound, under pain of punishment, to make himself an informer as to any treason or felony that he witnessed, or that came to his knowledge. His failure to give information as to such a crime made him guilty of the misdemeanor called misprision [1] of treason, or of felony, as the case might be, unless indeed he gave such countenance or aid as to make him a principal or an accessory before or after the fact. [2] Just how much knowledge one must have had to make it his duty to disclose what he knew, is not altogether clear. Some cases intimate that knowledge of the whereabouts of the body of a person who died from violence was enough. *Anon.* 7 Mod. 10. *King* v. *Soleguard*, Andrews, 231, 235, *S. C.* 2 Stra. 1097. *King* v. *Proby & Taylor*, 1 Kenyon, 250. 1 East, P. C. 378. But with respect to misprision of treason, "it was agreed that to make a misprision of treason, there must be a knowledge of the design, and of the persons, or some of them; for a man cannot be said to conceal what he doth not know; and therefore, if one tell I. S. in general, that there will be a rising without acquainting him with the persons who are to rise, or with the nature of the plot, if I. S. conceal this, this is no misprision of treason, because he hath no knowledge of the treason." J. Kel. 21, 22, quoted 8 Holdsworth, History of English Law, 323, 324.

---

[1] The word misprision has a broader meaning, immaterial in this connection, in which it signifies any misdemeanor, delinquency or failure of duty, particularly one that bears no specific name. 3 Holdsworth, History of English Law (3d ed. 1923) 389, note. 3 Co. Inst. 36, 139. 1 Russell, Crimes & Misdemeanors (7th ed. 1910) 10. *United States* v. *Perlstein*, 126 Fed. (2d) 789, 798.

[2] 3 Holdsworth, History of English Law (3d ed. 1923) 309, 388, 389. 8 *Ibid.* 323. 2 Bl. Com. Book IV, 120. Stephen, Digest Crim. Law (1877) Art. 157. 1 Hale, P. C. 374, 439. 2 Hawk. P. C. c. 29, §§ 10, 23. 3 Co. Inst. 139. 1 East, P. C. 377. It may be that "misprision of felony as defined by Blackstone is merely one phase of the system of communal responsibility for the apprehension of criminals which received its original impetus from William I, under pressure of the need to protect the invading Normans in hostile country, and which endured up to the Seventeenth Century in England." 8 Univ. of Chicago L. Rev. 340, 341, citing Morris, The Frankpledge System (1910), 29, 30.

Modern cases of prosecutions for misprision of felony in England have not been found, although there are instances of prosecutions for criminal obstruction of justice. *Regina v. Hamp,* 6 Cox C. C. 167. *Betts v. Stevens,* [1910] 1 K. B. 1. *Rex v. Manley,* [1933] 1 K. B. 529. The offence of misprision of felony has been said to be "practically obsolete" in England. 2 Stephen, Hist. Crim. Law (1883) 238.

Turning to America, the original settlers, when they came here, brought with them the common law of England and, as part of it, such English statutes as were in force at the time. Certain later English statutes enacted prior to the American Revolution were adopted and acted upon here without reënactment, and are made part of our law by the Constitution of Massachusetts, c. 6, art. 6. But not every principle of the English common law became part of the common law of Massachusetts. Some doctrines were judged inapplicable to the "new state and condition" of the settlers in this country, were rejected, and were never acted upon.[1] Among these were the authorization of the writ of *curia claudenda* (*Rust v. Low,* 6 Mass. 90, 95), the doctrine that a change in the use of land is waste (*Pynchon v. Stearns,* 11 Met. 304, 310, 311), and the doctrine of ancestral estate. *Cassidy v. Truscott,* 287 Mass. 515, 519.

Except when based upon statute, American cases recognizing the offence of misprision of felony are hard to find. *State v. Hann,* 11 Vroom, 228, was based upon a statute applicable only to persons having knowledge of the "actual commission" of certain crimes. A Federal statute, first enacted in 1790, provides that "whoever, having knowledge of the actual commission of the crime of murder or other felony cognizable by the courts of the United States, conceals and does not as soon as may be disclose and make known the same to some one of the judges or other persons in civil or military authority under the United States" shall be punished. Under this statute, mere omission to

---

[1] *Commonwealth v. Knowlton,* 2 Mass. 530, 534, 535. *Sackett v. Sackett,* 8 Pick. 309. *Going v. Emery,* 16 Pick. 107, 115, et seq. *Commonwealth v. Churchill,* 2 Met. 118, 123, 124. *Tyler v. Sturdy,* 108 Mass. 196. *Russ v. Alpaugh,* 118 Mass. 369, 373–375. *Phillips v. Blatchford,* 137 Mass. 510, 513, 514. *Crocker v. Justices of the Superior Court,* 208 Mass. 162, 166, 167.

disclose without positive concealment, is not enough. *Bratton* v. *United States*, 73 Fed. (2d) 795. *Neal* v. *United States*, 102 Fed. (2d) 643. See also *People* v. *Garnett*, 129 Cal. 364. The discussions in *Suell* v. *Derricott*, 161 Ala. 259, 272, 273, and in *Carpenter* v. *State*, 62 Ark. 286, 308, are merely dicta in cases of self-defence. *State* v. *Biddle*, 32 Del. 401, was a charge to a jury at nisi prius, after which the defendant was acquitted. The only American case in a court sitting in banc that we have found in which the offence was declared to exist in this country at common law, but with the limitations that "the motive prompting the neglect of a misprision must be in some form evil as respects the administration of justice" and that the evil motive must be alleged in the indictment, is *State* v. *Wilson*, 80 Vt. 249.

On the other hand, Chief Justice Marshall said, with the apparent concurrence of that learned Massachusetts judge Joseph Story, that a law punishing the mere failure to proclaim every offence that comes to one's knowledge "is too harsh for man." *Marbury* v. *Brooks*, 7 Wheat. 556, 575, 576. A number of American text writers have stated that the offence of misprision of felony is obsolete. 1 Wharton, Crim. Law (12th ed. 1932) § 289. 2 McClain, Crim. Law (1897) § 938. May, Law of Crimes (4th ed. 1938) § 12. In *State* v. *Graham*, 190 La. 669, 680, it was said of that statement that "the reason for that is that, in the modern acceptation of the term, misprision of felony is almost if not identically the same offense as that of an accessory after the fact," as indeed it is under the Federal statute already quoted. And in *People* v. *Lefkovitz*, 294 Mich. 263, 270, it was held that "In modern criminal law mere non-disclosure of knowledge of crime committed by another is not misprision of felony nor any substantive crime."

We need not decide in this case whether misprision of felony is a common law crime in this Commonwealth. Neither need we decide whether, if it is, the possible suspicion of the defendant that the body was that of Frances McGrath and that she had met with foul play was sufficient knowledge of a felony to make his silence criminal under

any circumstances. If misprision of felony exists in this Commonwealth, we think that the limitations stated in *State* v. *Wilson*, 80 Vt. 249, apply, and that an evil motive to prevent or delay the administration of justice must be shown. In this case there was no evidence of any such motive. The only rational inference from the evidence was that the failure to disclose the finding of the body was motivated by fear of self-crimination, or at least by fear of exposure of a criminal purpose wholly unconnected with the body. Such a motive, as the trial judge told the jury, would not permit a conviction. The motion for a directed verdict in favor of the defendant should have been granted.

*Exceptions sustained.*