# JOYCE LILLIAN POPE *v.* STATE OF MARYLAND

[No. 341, September Term, 1977.]

*Decided January 13, 1978.*

The cause was argued before THOMPSON, ■MENCHINE and LOWE, JJ.

*Thomas A. Lohm, Assigned Public Defender,* for appellant.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Laurence D. Beck, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Having sinned by silence when the circumstances cried out for her to protest a mother's prolonged and inhumane treatment of a three-month-old child, the appellant, Joyce Lillian Pope, was convicted in the Circuit Court for Montgomery County of child abuse and misprision of felony. Although we find that the record contained insufficient evidence upon which the child abuse conviction can be sustained, there is ample to sustain the misprision conviction. That, in itself, may be a cause for concern to the contemporarily indifferent or the uninvolved sophisticates, who deny being their brothers' keepers.[1]

Most lawyers know, if only vaguely from law school recollection that misprision of felony is the concealment and/or nondisclosure of the known felony of another. Perkins, *Criminal Law* 512, *et seq.* (2nd ed.). The crime has

---

[1]. Parenthetically, it could also give pause to the politically peripheral shadow people whose influence emanates from their knowledge of the whereabouts of buried bodies.

never been recognized in the appellate courts of Maryland however, and we are confronted here with the question of whether it is an indictable offense in this State. Since there is no statute here so proclaiming, we must look to the Common Law of England or her statutes as they existed on July 4, 1776, for that is the law to which the inhabitants of Maryland are entitled. Md. Const., Art. 5, Decl. of Rights. Recognizing that it is generally a foolish thing to make a long prologue and be short in the story itself, because of appellant's denial of the existence of such an offense, we must overlook that Apocryphal admonition.

### The Prologue

" . . . it is plain that there is and always has been an offense of misprision of felony and that it is not obsolete." *H. L. Sykes v. Director of Public Prosecutions,* 3 All E.R. 33, 40.

Whether particular parts of the common law are applicable to our local circumstances is a question for our courts to decide. *Gilbert v. Findlay College,* 195 Md. 508, 513; *State v. Buchanan,* 5 H & J 317. Such discretionary power to reject acknowledged common law concepts may exist in appellate courts, *e.g., Holland v. State,* 302 So. 2d 806 (Fla. App. 1974), however, as an appellate court with less than final jurisdiction we seldom analyze the philosophical appropriateness [2] of clear concepts of common law to present-day social conditions, *Hans v. Franklin Square Hosp.,* 29 Md. App. 329, 335, *cert. denied,* 276 Md. 744, and never address such questions raised in the abstract.

The primary question asked in this case is whether misprision of felony is "an indictable offense under the constitution and laws of this State." The argument raises the questions of whether that crime was one recognized under the Common Law of England when Maryland adopted that body of law, and if so, has the crime since been abandoned for obsolescence by its apparent non-use here. See *State v.*

---

2. See, *e.g.,* People v. Lefkovitz, 294 Mich. 263; but see Goldberg, *Misprision of Felony; an Old Concept in New Context* 52 A.B.A.J. 148.

*Magliano,* 7 Md. App. 286, 293. There is no argument made that this crime which is in the nature of a criminal cover-up is "inconsistent with the spirit of the Constitution and the nature of our political institutions", see *Gilbert v. Findlay College, supra,* at 513, or that it is:

" . . . inconsistent with or repugnant to the spirit and principles of republican institutions, whose strength lies in the virtue and integrity of the citizen to correct the morals and protect the reputation, rights, and property of individuals, . . . ." *Price v. Hitaffer,* 164 Md. 505, 510.

Appellant contends only that if viable in 1776 and thus adopted by Md. Const., Art. V, it has since atrophied to obsolescence by disuse.

Our prologuizing then, is restricted to determining whether misprision of felony was an offense known to the common law and subject to adoption by Art. 5 of the Declaration of Rights, since the facts here are inimical to a philosophical rejection of the crime for want of substantial justice in the case. If misprision is to be declared in the abstract philosophically repugnant to contemporary life, we leave that policy consideration for the Legislature, which may abrogate it by statute, or to the Court of Appeals which may change the common law when that law has become unsound in the circumstances of modern life. *Hearst Corp. v. St. Dep't of A.& T.,* 269 Md. 625, 643-644. It will suffice in this case simply to determine if misprision was a crime under the common law of England when we adopted it as our own in 1776 and leave whether it "should be" a crime for a more appropriate policy determination.

With that in mind, we necessarily look to England, the fountainhead of the common law. Fortune smiles upon our search. In 1061, the House of Lords was faced in *H. L. Sykes v. Director of Public Prosecutions, supra,* with the question of whether misprision of felony was an offense known to the law. Their answer:

"My Lords, it has been an offence for the last seven hundred years or more, not always under the name

'misprision of felony', but still an offence. Ever since the days of hue and cry, it has been the duty of a man who knows that a felony has been committed to report it to the proper authority so that steps can be taken to apprehend the felon and bring him to justice." *Id.* at 36-37.

In an opinion classic for its scholarship and commendable for its interest, Lord Denning relied upon jurisprudential forbears that strike awe into the heart of a legal scholar.

Sir William Staundford, summarizing a precedent from two cases, one decided in 1315 and the other in 1457, in *Plees Del Corone,* said:

> " 'If anyone happens to be present, when another is killed, or when a felony is committed, and did not come there in the company of the felons, nor was part of their confederacy, but nevertheless did not intervene, or disturb the felons, or raise hue and cry, he is not on that account to be held a principal or accessory, for it is not a felony in him but only an offence for which he can be fined like trespass' " *Sykes, supra,* 3 All E.R. at 37.

Lord Coke, in 1628, spoke upon the subject in his 3rd *Institute* p. 139:

> " 'Now are we to speak of concealement or not discovery of felony. As in case of high treason, whether the treason be by the common law, or statute, the concealment of it is misprision of treason. So in case of felony, whether the felony be by the common law, or by statute, the concealement of it is misprision of felony ... And as the concealment of high treason is higher by many degrees then the concealment of felony, so the punishment for the concealment of the greater is heavier then of the lesser, and yet the concealment of felonies in sherifs, or bailifs of liberties is more severely punished then in others, viz. by imprisonment by one year, and ransome at the will

of the King. [This is clearly a reference to the Statute of Westminster, 1275, c. 9, and shows that COKE too had in mind the 'hue and cry' cases.] From which punishment if any will save himself he must follow the advice of BRACTON, to discover it to the King, or to some judge or magistrate, that for administration of justice supplieth his place, with all speed that he can ... And this is intended of a concealment, or not discovery [that is, non-disclosure] of his meer knowledge: for if in case of high treason, he that knoweth it, before it be done, and assenteth to it, is particeps criminis, and guilty of treason: and in case of felony, he that receiveth the thief, and assenteth to it, is accessory.' " *Sykes, supra,* 311 E.R. at 38-39.

Chief Justice, Sir Matthew Hale, in 1670 added to this in his *Pleas of the Crown,* Vol. 1, p. 374:

" 'By what hath been said touching misprision of treason we may easily collect what is the crime of misprision of felony, namely, that it is the concealing of a felony which a man knows, but never consented to, for if he consented, he is either principal or accessary in the felony, and consequently guilty of misprision of felony and more.' " *Sykes, supra,* 311 E.R. at 39.

Recalling, perhaps, that the Titans of Greek mythology unsuccessfully stacked only three mountains in their attempt to reach Heaven, Lord Denning piled on a fourth to assure attainment of his goal.

Sir William Blackstone in the fourth book of his *Commentaries* combined the statements of Lord Coke and Sir Matthew Hale in his authoritative recognition of the crime:

" 'Misprision of felony is also the concealment of a felony which a man knows, but never assented to; for, if he assented, this makes him either principal, or accessory. And the punishment of this, in a public officer, by the statute Westm. 1. 3 Edw. I. c. 9. is

imprisonment for a year and a day; in a common person, imprisonment for a less discretionary time; and, in both, fine and ransom at the king's pleasure . . .' " *Sykes, supra,* 3 All E.R. at 39.

Nearly every author of any note from that day to this has followed these great names, and has said there is an offense of misprision of felony and described it in much the same terms [3] *Sykes, supra,* at 39. As explained interrogatorily by Lord Denning, "What need we of any further authority? If STAUNDFORD, COKE, HALE AND BLACKSTONE all say there is such an offence as misprision of felony, are we to say the contrary?"

Indeed, the United States has statutorily enacted such a crime in language not dissimilar to that describing the common law crime:

> "*Misprision of felony.* — Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both." 18 USC § 4,

and several states through the statutory inclusion of the common law of England have recognized the common law offense, *State v. Flynn,* 100 R. I. 520, 217 A. 2d 432; *State v. Biddle,* 2 W.W.Harr. 401, 124 A. 804; *State v. Wilson,* 80 Vt. 249, 67 A. 533; *Commonwealth v. Lopes,* 318 Mass. 453, 61 N.E.2d 849. But see *Holland, supra; Lefkovitz, supra,* and *State v. Young,* 7 Ohio App. 2d 194, 220 N.E.2d 146 (Ohio has no common law crimes), where the doctrine is rejected outright. Furthermore, language in our own Court of Appeals indicating that an agreement to prevent the apprehension of

---

3. *E.g.,* Harris, *Principles of Criminal Law* adopted by M.F. Force, p. 87 (1880); Chitty, I *Criminal Law* 3 (3rd Am. ed., 1836); Hochheimer, *Criminal Law* § 401 (2nd ed., 1904); Perkins, *supra;* Clark and Marshall, *Law of Crimes,* p. 547 (7th ed., 1967).

a criminal would be illegal in Maryland, provides some philosophical direction concordant with the philosophy of misprision of felony. See *Schirm v. Wieman,* 103 Md. 541. See also *Jackson v. State,* 10 Md. App. 337, 339, *cert. denied,* 260 Md. 721, where this Court acknowledges the crime of misprision of felony.

> "In the light of this history, it is plain that there is and always has been an offence of misprision of felony and that it is not obsolete." *Sykes, supra,* 3 All E.R. at 40.

We hold, therefore, that misprision of felony was a crime at common law given life in Maryland by Art. 5 of the Declaration of Rights. The contention that it has become obsolete or abandoned by disuse.is without merit. See *State v. Buchanan, supra,* 5 H & J at 359. A dearth of appellate cases is not proof that the crime has not been charged at trial level. Indeed, assuming disuse, we know of no limitations period placed upon the use of the common law. In *Jones v. Harris,* 35 Md. App. 556, this Court, and in *Harris v. Jones,* 281 Md. 560 (1977), the Court of Appeals, recognized for the first time in Maryland the common law tort of intentional infliction of emotional distress, a tort previously unacknowledged or arguably abandoned by non-use. Abandonment and laches do not apply to common law concepts.

> "My Lords, it was said that this offence is out of date. I do not think so. The arm of the law would be too short if it was powerless to reach those who are 'contact' men for thieves or assist them to gather in the fruits of their crime; or those who indulge in gang warfare and refuse to help in its suppression. There is no other offence of which such persons are guilty save that of misprision of felony. I am not dismayed by the suggestion that the offence of misprision is impossibly wide; for I think it is subject to just limitations. Non-disclosure may be due to a claim of right made in good faith. For instance, if a lawyer is told by his client that he has committed a

felony, it would be no misprision in the lawyer not to report it to the police, for he might in good faith claim that he was under a duty to keep it confidential. Likewise with doctor and patient, and clergyman and parishioner. There are other relationships which may give rise to a claim in good faith that it is in the public interest not to disclose it. For instance, if an employer discovers that his servant has been stealing from the till, he might well be justified in giving him another chance rather than reporting him to the police. Likewise with the master of a college and a student. But close family or personal ties will not suffice where the offence is of so serious a character that it ought to be reported. In 1315, it was held that it was the duty of a brother to raise hue and cry against his brother and he was fined for not doing so; see 24 *Selden Society,* pp. 144, 145: and in 1938 a mistress was found guilty of misprision for shielding her lover (Mrs. Casserley's case (21)). The judges have not been called on further to define the just limitations to misprision, but I do not doubt their ability to do so, if called on." *Sykes, supra,* 3 All E.R. at 42.

Because appellant questions the sufficiency of the evidence to convict of misprision of felony (as well as of child abuse), we must touch upon the elements of the crime prerequisite to conviction. *Sykes, supra,* acknowledges only two necessary elements; knowledge and concealment. We agree with that general appraisal; however, there are nuances of each element wherein some would depart from the English view.

### Knowledge.

The accused must know that a felony has been committed by someone else. This knowledge is provable as in other criminal cases, *i.e.,* by asking whether a reasonable man with the same facts and information before him would have known that a crime had been committed. If the answer is in the affirmative and the serious crime a felony, the proof of knowledge is sufficient.

*Concealment.*

The accused must have concealed or kept secret his knowledge. Evidence must show that he failed or refused to perform his duty when there was a reasonable opportunity available to him to disclose to proper authorities all material facts known to him relative to the offense — except when the Fifth Amendment eliminates the duty to disclose such information. *Cf. United States v. Daddano,* 432 F. 2d 1119, *cert. denied,* 402 U. S. 905; *United States v. Pigott,* 453 F. 2d 419.

When and whether there was a "reasonable opportunity available" to the accused to disclose (which determines the time element of when the duty becomes manifest) are factual issues for determination by the factfinder. The lack of reasonable opportunity to disclose is or may be a valid defense because, while it is implicit that the duty arises at the first opportunity, that opportunity must be apparent and without risk of harm to the accused. No penalty is to be imposed for a failure to accomplish the impossible.

In *Sykes* there was at issue the question whether the concealment ingredient required some active conduct, and it was held that in England misprision requires nothing active. The failure or refusal to disclose the felony is enough. But in America we are faced with strong dicta from a civil case opinion written by a former Chief Justice of the United States in *Marbury v. Brooks,* 20 U. S. 556, 575, to the effect that mere silence is insufficient to sustain an indictment.

> "It may be the the [sic] duty of a citizen to accuse every offender, and proclaim every offense which comes to his knowledge; but the law which would punish him in every case for not performing this duty is too harsh for man."

Under the federal misprision statute, 18 USC § 4, in six jurisdictions the conjunctive terms have been held to mean that *both* the act of concealment of a felony *and* the omission to make it known must be proved to support a federal statutory conviction. Shannonhouse, *Misprision of a Federal Felony,* 4 Balto. Law Rev. 59, 69-70. In both Vermont (*Wilson,*

*supra*) and Massachusetts (*Lopes, supra*), the element of "evil motive" or mens rea has been added in lieu of active conduct. See also 1 Bishop, *Criminal Law* § 721 (a) (9th ed. 1923).[3A]

Since Maryland has never met these tangential questions, it would seem that we must adhere to the common law of England as it was in 1776, as set forth in Art. 5 of the Declaration of Rights, rather than judicially legislate that for which we have no authority. We are told by the House of Lords that:

> " ... misprision requires nothing active. The failure or refusal to disclose the felony is enough." *Sykes, supra,* 3 All E. R. at 41.

While we are not bound by current opinions of the House of Lords, its view of what comprised the elements of its common law prior to 1776 is hard to gainsay. If in the application of that common law, active concealment is found to be more contemporarily compatible to a determination of criminal culpability than is indifference, such policy is for our Legislature or Court of Appeals to say. The issue was not raised in the case before us in any event, perhaps because the facts implicitly indicated an active concealment. Mrs. Pope's failure to respond fully when questioned by the police on the cause of the child's death was almost as active a concealment of the truth as was the denial of Jesus by the Apostle Simon-Peter.

### The Story

Following a Friday evening service at the Christian Tabernacle Church, the appellant, Joyce Lillian Pope, agreed to permit Melissa Norris and her 3-month-old child, Demiko, to stay at appellant's home. During that evening and the following morning appellant assisted Melissa with the child by assuming some of the maternal functions such as preparing its bed (in a dresser drawer), changing the child and feeding him.

Melissa's conduct that evening and the following day

---

**3A.** It should not be inferred from our failure to expostulate that we foreclose such mitigatory defenses as excuse or justification for failure to report at the first reasonable opportunity.

sporadically indicated some sort of mental distress. She would at times seem caught up in a religious frenzy with a wild look about her, trying to preach and declaring that she was God. She would as quickly resume her normal self without ever seeming to notice her personality transitions. This changing back and forth continued throughout the following day, Saturday, even during a "shower" party that evening attended by the mother, the child and the appellant. Because of this strange conduct, appellant admitted some concern for the child's safety and watched it "like it was [her] own", prevailing upon Melissa to let the child sleep in a dresser drawer, rather than in bed with the mother, as Melissa had suggested, because she feared the mother might roll over on the child during the night.

The following morning Melissa's episodes of "changing to God" became more and more pronounced. She stomped and gestured as she strode back and forth, putting crosses on doors and demanding the departure of the evil which she claimed to see. She kicked and banged at the door of appellant's son, and fearful that by breaking in Melissa would frighten him, appellant unfastened the door to permit entry. Loudly exhorting Satan to leave the premises, Melissa "annointed" appellant's son with oil, placing some of the oil in this child's mouth. She subsequently repeated the process with appellant's daughter. When dressed, appellant's children left the house expeditiously, lingering only long enough to embrace their mother.

Melissa's changing process continued. Finally, while still appearing to be herself, she prepared a water tub to bathe the baby. Then, from her suddenly changed voice and appearance, appellant knew Melissa had changed again to "God". Calling out that Satan had hidden in the body of her son, Melissa began to verbally exorcise that spirit and physically abuse the child by punching and poking him repeatedly about the stomach, chest and privates. After she undressed the child, that which ensued was hardly describable. In her religious frenzy of apparent exorcism, Melissa poked the child's vitals and beat the child about the head. She reached her fingers down its throat, wiping mucus and blood on diapers at hand, and even lifted the child by inserting her hands in its mouth, and shook him like a rag.

Appellant, Joyce Lillian Pope, watched but did nothing else during this entire episode. She neither participated in the abuse nor tried to prevent it. Whether from fear or fervor, her abstinent conduct manifested total indifference. Her testimony sought to indicate that her passivity was motivated by fear but other evidence belied that inference. Her sister, Angela, came to the door as Melissa's frenzy diminished, and was let in by appellant who tried to tell Angela what had happened — but couldn't. Appellant, on advice from Angela, locked the door so that Angela's children would stay in the yard with appellant's.[4] Angela wrapped the dead or dying child in a towel, held the comatose body over her head and prayed. Although the record is not clear as to when, sometime during or soon after its ordeal, the child mercifully expired.

The three adults (appellant, her sister and Melissa) left with the child, destined ultimately for the church located in the District of Columbia. Angela drove to the home of Melissa's grandfather, with whom Melissa had lived. According to the grandfather *both* appellant and Melissa were in a religious frenzy.

> "Q Who was saying that they were Jesus Christ at this point?
>
> A Melissa and Joyce Pope.
>
> Q All right. And what happened then?
>
> A They just carried on and carried on. So Joyce

---

4. The State contends that appellant went outside to chasten the children who were peeking in the window and chase them away. The record seems to indicate that this occurred when the three adults left with the baby. Whatever the interpretation of the statement, the simple comment by one of the children is insufficient to sustain a conviction of child abuse as a principal in the second degree.

"Q Let me ask you one other question now, Earl. After Popey called you away from the window, did you see Joyce Pope again?
MR. LOHM: Objection. He has answered the question.
THE COURT: I think he has answered that. He said he saw her leave.
Go ahead and answer it again.
BY MR. BECK:
Q Did you see Joyce Pope again?
A The only time, when she came outside.
Q When she came outside, what did she do?
A Well, see, we was making noise and was looking in the window. She came out, she gave us a beating.
Q With what?
A I forgot."

— I mean Joyce kept telling me there was a dead baby in the car, and for me to go and open his eyes and look at him, his heart was like a stone.

Q Did you do that?

A No, sir. By the way they was carrying on, I didn't believe that they knew what they was talking about.

Q What happened then?

A Well, after I didn't go, Joyce went to the car and got the baby —

Q What car was this? Was this the car they had come in?

A That is the car they came in.

Q What happened then?

A She brought the baby back to me and tried to give it to me, and told me to look at it, it was dead; its heart was like a stone.

I still didn't take the baby."

After leaving that scene, the trio arrived at a nursing home where they picked up another member of the congregation of the Christian Tabernacle telling her that "God has a job for you to do." They continued on to the church passing in their journey two or three hospitals and several rescue squads and police stations.

At the church the child was given to, or taken by, the Reverend Leon Hart who gave him to Mother Dorothy King for her prayers. Mother King discovered that the child's body was cool and sent for ambulance assistance from the firehouse across the street. Police and rescue personnel arrived and determined that the child was dead.

The first police officer on the scene saw appellant but did not address her. A detective from the District of Columbia Homicide division arrived and interviewed Melissa and appellant together.

"Q All right. What was it that occurred between you and Melissa in Joyce's presence?

A What I did was I asked the mother the pertinent facts about the baby. My questions usually in an

infant death are date of birth, what hospital, the term of pregnancy, how long — if the baby was released from the hospital at the same time as the mother, prenatal care, postnatal care, when was the last time the baby was fed, was it burped, and questions relevant to our medical examiner's inquiry.

Q All right. Did th-re [sic] come a time when you asked her what if anything had happened to the baby?

A Yes, sir.

Q And what was her response to that?

A The mother stated that sometime during the afternoon she was bathing the baby, the baby suffered shortness of breath, but she didn't — she didn't take too much concern, because it seemed to go away. And they dressed the baby, and then while bringing it in the car, it lapsed into an unconscious condition.

Q And then was there anything further with reference to that, to what they did with the baby?

A They took it to a nursing home, I believe, and stopped by and talked to a woman there, who in turn brought them to the church, accompanied them to the church.

Q All right. Did you make any inquiry further of Melissa Norris with reference to any potential injuries to the baby?

A Yes. I asked, one of my questions was, did the baby ever fall? She replied no. I said, 'Did you ever strike the baby, hit the baby, cause any injuries to the baby?'

Q What was her response to that?

A No.

Q What was Joyce Pope's response, if any, to this series of questions to Melissa Norris?

A None.

Q Did there come a time when you spoke with Joyce Pope?

A Yes, I did.

Q What were the conditions under which you spoke to Joyce Pope?

A The same conditions. I just sat at the desk when she was across the room, in everybody's company.

Q Who was there at the time?

A Melissa, myself, and I believe the reverend. Like I said, he kept walking in and out of the room.

Q At that time, what was the status of this case?

A At that time my investigation showed that it probably was just a natural death.

Q Had anyone at all been placed in custody at that point?

A No, sir.

Q Was anyone in any way under arrest or restrained in any fashion?

A No, sir.

Q Did you advise anyone, specifically Joyce Pope, did you advise Joyce Pope of her rights in any fashion?

A No, sir.

Q At that juncture, how were you viewing Joyce Pope? What was your — why was it you were going to ask her some questions?

A She was the roommate of Melissa.

Q All right. Did there come a time when you did ask her some questions?

A Yes.

Q And what information did she give you?

MR. LOHM: Objection.

THE COURT: I will overrule it.

THE WITNESS: It was with regards to feeding, and —

MR. LOHM: I didn't understand.

THE WITNESS: In regard to feeding the baby, and I asked — she related she had fed the baby sometime around four o'clock, nothing unusual, and then again sometime around 8 —

THE COURT: This is 4:00 a.m.?

THE WITNESS: 4:00 a.m. in the morning, and sometime again around 8:00 or 9:00 in the morning.

BY MR. BECK:

Q Did she give you any further information at all?

A None, sir.

Q Did you have any further conversation with Melissa Norris?

A Yes. I explained to her that an autopsy would be performed, and where the body was going, and the arrangements she was to make with the funeral home in regards to picking the baby up and burying it.

Q Throughout the course of this period of time, other than the statements with reference to feeding, did Joyce Pope give you any information with reference to your investigation?

A No, sir."

The following day the Montgomery County police began their investigation and appellant was brought to the station. At that interview, for the first time, appellant disclosed what had happened.

### Child Abuse

The trial judge found appellant guilty of child abuse and premised his finding on alternative theories. The first he stated succinctly, perhaps too succinctly for us to fully comprehend his reasoning:

"In support of the verdict sane and guilty of child abuse, the Court is satisfied beyond a reasonable doubt that under the doctrine of State v. Fabritz, cited at 276 Maryland [416,] 424, the defendant is a principal and is guilty of child abuse." [5]

---

5. It is difficult to rationalize under Fabritz the court's finding of guilt of child abuse and not guilty of manslaughter when the Fabritz concept was founded upon a manslaughter case, Palmer v. State, 223 Md. 341:

" . . . where in affirming an involuntary manslaughter conviction of a mother who knowingly permitted her infant child to be subjected to prolonged beatings by her paramour, we concluded that although the direct and immediate cause of the child's death was attributable

The doctrine of *Fabritz* was simply a broadened area of proscribed conduct interpreting the "cause" of an injury to include a failure to seek assistance for an injury. The case did not extend the class of persons to whom the statutory proscription expressly applies nor even discuss that aspect of proof since the accused there was the victim's mother. By its terms the statute (Md. Code, Art. 27, § 35A) applies to:

> "Any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child . . . ."

In *Bowers v. State,* 38 Md. App. 21 (1977), we held that language to be sufficiently explicit

> " . . . to inform a person of ordinary intelligence whether or not he comes within the class of persons against whom the statute is directed . . . ."

In *Fabritz, supra,* the appellant was the victim's natural parent who was not present when the actual cause of initial injury occurred. In the case at bar the appellant was a hostess-witness to the injury which was inflicted by the natural parent. Although acquiescing in appellant's maternal ministrations to her child, the mother at no time, directly or indirectly, relinquished her "responsibility for supervision" of her child to appellant.

The State contends that because appellant admitted considerable concern for the child and actually took steps to protect the child from its mother (*e.g.,* providing a dresser drawer bed so the mother wouldn't roll on it in her sleep), she thereby assumed the role of a surrogate parent. That the child's mother was continually present, and caring for her child during her self-possessed times is explained by the State as conduct permitted by appellant but manifesting "no indication whatsoever that appellant intended to relinquish her responsibility." That puts the cart before the horse. It is the mother whose responsibility was not relinquished or

---

to blows struck by the mother's paramour, her failure to remove the child from the paramour's presence constituted gross and criminal negligence and 'was a contributing cause of . . . [the child's] unfortunate death.' 223 Md. at 353." Fabritz, *supra,* 276 Md. at 424-425.

absolved. Appellant had no right to usurp that role. We cannot in good conscience hold that a person who has taken in a parent and child is given the responsibility for the child's supervision and protection even while the child is in the very arms of its mother. Penal statutes should be strictly construed with reference to the purpose to be accomplished and not interpreted as conveying an intent different from their plain meaning. *Fabritz, supra,* 276 Md. at 421-422.

Having been wrong in interpreting the legislative intent of the child abuse statute in *Fabritz v. State,* 24 Md. App. 708, we approach that hallowed ground with trepidation, but it is inconceivable to us that the legislative scheme intended to shuffle the supervisory responsibility in such circumstances. In construing statutes, results that are "unreasonable, illogical or inconsistent with common sense" should be avoided, with the real legislative intention prevailing. *State v. Fabritz, supra,* 276 Md. at 422. There is, of course, the temptation to stretch, just a little further, an interpretively strained statute to punish such callous indifference, but to do so would mandate generally an affirmative responsibility to "become involved" if not as our brother's keepers, at least as our children's. *Holland v. State, supra,* 302 So. 2d at 810. Such policy considerations are beyond the aegis of this Court. In this case there is no evidence that appellant had adjudged the mother incompetent in order to obtain custody of her child, nor had appellant any right to do so. Her concern for the child does not convert to legal responsibility nor parental prerogatives. Because appellant does not fall within the class of persons to whom the child abuse statute applies, the question of whether the parental failure to seek assistance doctrine of *Fabritz* would apply is meaningless.

### Principal in the Second Degree

To his initial holding, the trial judge added an alternative:

"If this interpretation of Fabritz is in error, then the defendant is guilty as a principal in the second degree. Among the facts to support this finding are the following:

1. The events of the beating took place in the defendant's own home.

2. She responded to the commands of the perpetrator during the course of events. For example, she looked when told to look; she came when called.

3. She voluntarily opened the door to the room where her own son was sleeping so that Melissa Norris could reach him.

4. She failed to interfere or question Melissa Norris' activity, even during the periods when Melissa was rational. For instance — immediately after attacking and terrifying defendant's son, Maurice Pope. She opened the outside door to permit her sister to enter, and then locked it after her entrance. She drove the children away from peering into the house from the outside. She wrapped the baby in a sheet after the beating. She disposed of the baby's bloody clothing by wrapping it in a towel and placing it in a trash container. Her possession of and displaying the baby to Mr. Norris at the Inwood Avenue residence following the beating. And finally, her failure to make any report to any person of authority or any medical personnel at any time, or to stop during the ride to Inwood Avenue, thence to the Bel-Pre Nursing Home and back to the church in the District of Columbia, to seek assistance of any of the numerous medical, fire and rescue, or police facilities passed during this journey."

Principals in the second degree are those persons present, actually or constructively, aiding and abetting the commission of the crime, but not themselves committing it. *Agresti v. State,* 2 Md. App. 278, 280.

Responding seriatim to the trial judge's findings we are unable to discern conduct of appellant describably encouraging or assisting the mother in the *commission* of the crime.

1. There is no evidence that the situs was provided by appellant for the purpose of the abuse, as implied by the trial judge. All evidence indicates the home was incidental to the commission of the crime, not provided for it. 2. That appellant came when called and observed the commission of the crime

does not constitute encouragement or assistance in its commission. 3. Nor was her opening of the door to her son's bedroom a part of the commission of the crime. It preceded the crime and did not relate to the victim. These acts and omissions, like her failure to interfere, may be considerations, but they are reeds far too slender upon which to convict an accused as a principal.

A compelling element in the determination of guilt or innocence of the person charged is the consideration of all the alternate circumstances surrounding the presence of an accused at the scene by the trier of facts. *Malcolm v. State,* 232 Md. 222; *Tasco v. State,* 223 Md. 503, *cert. denied,* 365 U. S. 885. It would be intellectually dishonest, for example, to permit an inference from mere presence that the accused was available as a lookout. It is equally wrong to permit culpable inferences from ordinary conduct associated with mere presence. The fact that a person witnesses a crime and makes no objection to its commission, and does not then notify the police, does not, of itself, make that person a participant in the crime. *Watson v. State,* 208 Md. 210; *Coleman v. State,* 4 Md. App. 386, *cert. denied,* 252 Md. 730.

4. The other doings of appellant referred to by the judge such as opening the door for her sister, locking it to keep out the children, chastizing them as she left the premises for "peering", disposing of baby clothes, and showing the dead child to the grandfather, were all acts performed *after* the commission of the crime. Evidence of such conduct may have been used to establish that she was an accessory *after* the fact, but it is not· consonant with a finding of aiding or encouraging the commission of the crime — and appellant was not tried as an accessory. See *Agresti, supra,* at 281. Finally, in regard to child abuse, her failure to seek or obtain medical assistance for the child is premised upon the *Fabritz* doctrine and we have held appellant was not within the class to which the statute was intended to apply.

We find that there was insufficient evidence to sustain the verdict of guilty of child abuse and the court was clearly in error so to do. Md. Rule 1086. The appellant did not have custodial responsibility for the child sufficient to warrant her conviction as a principal in the first degree, and the sparse if inferably affirmative conduct coupled with her presence did

not provide a sufficient degree of participation to indicate encouragement or assistance. Mere presence creates a thin line whence vicarious encouragement begins and noninvolvement ends, but the State's burden to prove, beyond a reasonable doubt, assistance and encouragement must show to some degree an affirmative act.

Sir William Staundford's summary of precedent in his *Plees Del Corone,* c. 44, p. 40E, seems most appropriate as an epilogue to our holding on evidentiary sufficiency for child abuse and a prologue to misprision of felony. It bears repetition elliptically:

> " 'If anyone happens to be present, when another is killed, or when a felony is committed, . . . but nevertheless did not intervene, or disturb the felons, or raise hue and cry, he is not on that account to be held a principal . . . .' "

### Misprision of Felony

The felony that appellant was charged with concealing and failing to disclose was the murder of Demiko Lee Norris committed by his mother, Melissa Vera Norris.[6] The evidence was sufficient to sustain that verdict.

The knowledge that a felony was committed was proven through appellant's own testimony that she witnessed, but did not participate in, the tortured killing of Demiko by his mother. From her own description of the event a reasonable person in her place would have known that a felony had been committed. Certainly the offense was of "so serious a character that an ordinary law-abiding citizen would realise he ought to report it to the police." *Sykes, supra,* 3 All E.R. at 41-42.

The concealment or failure to disclose was apparent when

---

6. Although the issue was not raised below or here, we note that there is no requirement that there be a conviction of the underlying felon as a prerequisite to convict for misprision. It is sufficient if in the misprision case the trier of fact determines, beyond a reasonable doubt, that a felony was committed, of which the accused had knowledge, and that an opportunity to disclose the crime's commission to the authorities was presented to the accused. *Cf.* Ford v. State, 274 Md. 546, 550-551.

In this case, Melissa Vera Norris escaped the responsibility for her conduct, having been determined insane at the time of the commission of the crime. We were informed at argument that she has since been released as sane and has given birth to another child.

appellant bypassed numerous "reasonable opportunities available" to her to do so.

1. The State proved that the route followed from appellant's home to the church passed hospitals, rescue squads and police stations. No effort was made by appellant to report the crime at any of these places.

2. No effort was made by appellant to report the crime to any authority during the stop at Melissa's grandfather's home despite her acknowledgment that the child was dead.

3. No effort was made by appellant to report the crime during the stop at the Bel Pre Nursing Home when the fourth passenger was picked up.

4. No effort was made to report the crime upon arrival at the church or after Mother King sought help, although officials of various sorts were about.

5. An overt concealment was manifested by appellant's silence during the interrogation of Melissa when the District detective interviewed her in appellant's presence in a room at the church. Her limited responses upon hearing Melissa's false recitation of the child's death and its cause constituted an active concealment. The false report in her presence (if not the questions to her) gave rise to a duty to speak. *Cf. Ewell v. State,* 228 Md. 615.

6. Finally, as pointed out by the trial judge, an additional act of concealment occurred when, having knowledge of Melissa's misstatements of the events, appellant again extended to Melissa the comfort of her home, without having reported the crime to any authority.[7]

That appellant ultimately admitted to the authorities the following day what may have actually occurred does not relieve her from the abrogation of her responsibility to have reported the crime when there were "reasonable opportunities available".

### Scope of Cross-Examination and Rebuttal

Appellant questions finally the discretion of the trial judge in permitting cross-examination of appellant beyond the scope

---

7. This conduct was also inferentially a "form [of] evil as respects the administration of justice" which is the mens rea substituted for active concealment judicially conceived in Vermont and Massachusetts. See State v. Wilson, 80 Vt. 249 and Commonwealth v. Lopes, 318 Mass. 453. We find no common law authority for an evil motive prerequisite, however.

of her precise testimony on direct and then rebutting that response. We find no abuse of discretion in permitting examination to amplify the events relevant to the misprision charge which occurred after the major crime, *Robinson v. State,* 18 Md. App. 678, 698-700, *cert. denied,* 269 Md. 765, and appellant does not question that the rebuttal testimony rebutted that which we find to have been properly so elicited. See *State v. Hepple,* 279 Md. 265.

> *Judgment of guilty of child abuse, reversed.*
> *Judgment of guilty of misprision of a felony, affirmed.*
> *Costs to be divided equally between appellant and Montgomery County.*