560 S.E.2d 430

**The STATE, Respondent,**

v.

**Dorothy SMITH, Appellant.**

**No. 3440.**

Court of Appeals of South Carolina.

Heard Jan. 10, 2002.

Decided Feb. 4, 2002.

Rehearing Denied March 21, 2002.

602

Deputy Chief Attorney Joseph L. Savitz, III and Assistant Appellate Defender Eleanor Cleary, of the South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert E. Bogan and Senior Assistant Attorney General Charles H. Richardson, all of Columbia; and Solicitor J. Gregory Hembree, of Conway, for respondent.

ANDERSON, J.

Dorothy Smith ("Appellant") appeals her conviction for misprision of a felony, arguing the trial court erred in denying her motion for directed verdict. We affirm.

### FACTS/PROCEDURAL BACKGROUND

Lena Mae Grier was found dead at approximately 2:30 p.m. on December 30, 1996. She was the victim of a shooting during a robbery of her Georgetown County convenience store.

Several people saw Grier in the hours before her death. Grier's daughter, Patsy Lewis, lived about a half-mile from the store. Lewis took lunch to Grier around 12:00 p.m. and stayed to help her with the lunchtime rush because her mother was working alone. There were no customers in the store when Lewis left at 1:30 p.m.

Mike Simmons, Grier's friend and pastor, arrived at the store shortly after Lewis departed and visited with Grier until 2:15 p.m. While Simmons was there, a man—whom Simmons identified as Marion Smith ("Marion"), Appellant's husband—entered the store and bought cheese and a few other items. Simmons left Grier shortly after the man exited the store. As Simmons was leaving, he held the door for a female customer

entering the store. At that time, Simmons noticed the man he had seen in the store was parked outside in a blue station wagon. Simmons additionally observed a woman—whom Simmons identified as Appellant—seated in the station wagon's front passenger seat.

Clementine Verner, a longtime customer of Grier's, was the woman entering the store as Simmons left. Verner had noticed the blue station wagon with the two occupants when she arrived. She stayed approximately 10 to 15 minutes in the store, conversing with Grier and purchasing a few items. When Verner left, there were no customers in the store; however, she saw the station wagon and its occupants were still in the parking lot. According to Verner, the pair was eating crackers and what appeared to be cheese. Verner recognized Appellant and Marion as persons she had seen at the store occasionally, although she did not know them personally.

Grier's body was found around 2:30 p.m. by her son-in-law, Thomas Lewis. The cash register and Grier's pocketbook were missing from the store. Following the robbery and murder, Simmons reported what he had seen while at the store to Georgetown County Sheriff's Department investigators. He also shared his observations with Lewis.

The following morning, Lewis prepared her home for the reception of family and friends. The first people to arrive were Appellant and Marion. Lewis did not know either of them. Appellant explained their presence at Lewis' home by relating that she and Marion had been at Grier's store at 12:30 the day before and, upon hearing of Grier's death, had come to express their condolences.

Lewis had been in the store from 12:00 to 1:30 p.m. the previous day and did not remember seeing either Appellant or Marion. When Lewis asked Appellant if she was sure about the time, Appellant averred she was certain. Lewis recalled Simmons' description of the people he had seen while at Grier's store. Lewis excused herself and had Simmons paged with an urgent message for him to come to her home immediately.

Simmons rushed to the residence after getting the message. Upon entering the home, Simmons instantly recognized the

couple as the people he had seen at Grier's store. He left the room after a moment of polite conversation and telephoned the sheriff's department. Investigator Robert Medlin instructed Simmons to ask Appellant and Marion to drive over to Grier's store, where they would be met by Medlin and Carter Weaver, a South Carolina Law Enforcement Division agent assisting in the investigation.

Appellant and Marion complied with Simmons' request and proceeded to the store. Once there, the couple was joined by Medlin and Weaver. After a brief conversation, Medlin and Weaver asked the two to come with them to a nearby sheriff's department substation. Appellant and Marion agreed.

Appellant and Marion were interviewed separately at the substation. They were not suspects; instead, the police treated the two as witnesses. Investigators queried both about their trip to Grier's store. At Appellant's trial, Agent Weaver reported what Appellant said in response:

> [Appellant] related to us that she was not aware of the time when they were actually at the store and she stated that they had earlier in that day gone to Marion, South Carolina, to pay some car taxes and had come back through to [Grier's] store to get—for the purpose of getting some cheese and some other miscellaneous food and that they all—[Marion] went in and got the cheese. [Appellant] stayed in the car. [Marion] came back to the car, went back in and got some cigarettes and then they left.

Appellant made no further statements nor gave investigators any other indication she had witnessed the robbery or murder. The police let the couple go home.

After comparing Appellant's account of the events relating to the trip to Grier's store with that of her husband's, investigators obtained and executed a search warrant of the couple's home. Appellant and Marion were considered suspects at this point. Appellant accompanied Investigator Medlin and Agent Weaver back to the sheriff's department substation. Once there, the investigators mirandized Appellant and asked her to make a statement. Appellant waived her rights and gave a statement. Appellant admitted that when her husband made his second trip into Grier's store, she heard a "pow" and saw

Marion running out of the store carrying a cash register and a pocketbook.

The interview at the substation was not recorded by either audio or video device. Appellant was later transported to the sheriff's department headquarters, where she gave the same statement during a taped interview.

Marion was indicted for the robbery and Grier's murder. He was later acquitted on all charges.

Appellant was initially indicted for accessory after the fact. The Georgetown County Grand Jury later returned an indictment against her for misprision of a felony. At trial, the circuit judge directed a verdict for Appellant concerning the accessory charge.[1] The judge, however, denied Appellant's directed verdict motion for the misprision of a felony count. Appellant was convicted and sentenced to eight years imprisonment. Appellant appeals.

### STANDARD OF REVIEW

Our Supreme Court's recent decision in *State v. McHoney*, 344 S.C. 85, 544 S.E.2d 30 (2001), edifies regarding the proper scope of review of a trial judge's denial of a motion for directed verdict in the criminal trial setting:

A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. Brown*, 103 S.C. 437, 88 S.E. 21 (1916). In reviewing a motion for directed verdict, the trial judge is concerned with the existence of the evidence, not with its weight. *State v. Mitchell*, 341 S.C. 406, 535 S.E.2d 126 (2000). On appeal from the denial of a directed verdict, an

---

1. In *State v. Collins*, 329 S.C. 23, 495 S.E.2d 202 (1998), our Supreme Court held absence is not an essential element of the offense of accessory after the fact, but ruled retroactive application of the new rule altering the elements of the offense would result in a Due Process Clause violation. The Court noted that while *ex post facto* violations do not apply to actions of the judicial branch, judicial decisions applied retroactively can violate the Due Process Clause and operate precisely like an *ex post facto* law. *Id.* at 27–28 & 28 n. 4, 495 S.E.2d at 205 & 205 n. 4. Because Appellant's offense occurred in 1996—before the change in the law—the trial court directed a verdict on accessory after the fact because absence from the scene was a necessary element under the pre-*Collins* law.

appellate court must view the evidence in the light most favorable to the State. *State v. Burdette*, 335 S.C. 34, 515 S.E.2d 525 (1999); *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury. *State v. Pinckney*, 339 S.C. 346, 529 S.E.2d 526 (2000).

*Id.* at 97, 544 S.E.2d at 36.

## *LAW/ANALYSIS*

On appeal, Appellant contends the Circuit Court erred in denying her motion for directed verdict on the charge of misprision of a felony. Specifically, she contends there was no direct or substantial circumstantial evidence to support the charge as a matter of law because she was protected by the privilege against self-incrimination. We disagree.

In *State v. Carson*, 274 S.C. 316, 262 S.E.2d 918 (1980), the Supreme Court expressly stated the crime of misprision of a felony is a cognizable offense in South Carolina jurisprudence. The *Carson* Court defined "misprision of a felony" as:

[A] criminal neglect either to prevent a felony from being committed or to bring the offender to justice after its commission, but without such previous concert with, or subsequent assistance of, him as will make the concealer an accessory before or after the fact.

*Id.* at 318, 262 S.E.2d at 920 (citations omitted).

The Court further stated:

Under the federal and state statutes embodying the offense, mere silence or failure to come forward is not enough to constitute misprision; there must be some positive act of concealment of the felony.

*Id.* (citation omitted).

"While it is true the privilege [against self-incrimination] sometimes works to bar prosecution for misprision, this is only when the statements concealed would incriminate the defendant as an accessory or principal in the protected felony." *Id.* at 319, 262 S.E.2d at 920 (citations omitted).

Inferentially, there are two elements of the offense:

(1) knowledge; and

(2) concealment.

■ Regarding the element of knowledge:

The accused must know that a felony has been committed by someone else. This knowledge is provable as in other criminal cases, *i.e.*, by asking whether a reasonable man with the same facts and information before him would have known that a crime had been committed. If the answer is in the affirmative and the serious crime a felony, the proof of knowledge is sufficient.

*Pope v. State,* 38 Md.App. 520, 382 A.2d 880, 885 (1978), *aff'd in part, rev'd in part,* 284 Md. 309, 396 A.2d 1054 (1979) (reversing appellant's conviction for misprision of a felony on the basis Maryland no longer recognizes this common-law offense while noting the state legislature could enact it as a statutory offense).

■ Concerning the element of concealment:

The accused must have concealed or kept secret his knowledge. Evidence must show that he failed or refused to perform his duty when there was a reasonable opportunity available to him to disclose to proper authorities all material facts known to him relative to the offense except when the Fifth Amendment eliminates the duty to disclose such information.

*Id.* (citations omitted); *see also In re Morris,* 164 Ariz. 391, 793 P.2d 544, 546 n. 1 (1990) ("The elements of the crime of misprision of felony have been stated to be: (1) a felony was committed, (2) defendant had knowledge of the felony, (3) defendant failed to notify authorities and (4) defendant took an affirmative step to conceal the crime.... Mere passive failure to report a felony has been held insufficient to sustain a conviction.") (citations omitted).

■ Although the issue was not raised at the trial level or in this venue, we note there is no requirement that there be a conviction of the underlying felony as a prerequisite to convict for misprision of a felony. *Pope,* 382 A.2d at 892 n. 6. It is sufficient if the trier of fact determines that a felony was committed, of which the accused had knowledge, and that an opportunity to disclose the crime's commission to the police was presented to the accused. *Id.*

In the instant case, the felonies Appellant was charged with concealing and failing to disclose were the robbery and murder of Grier. At trial, the circuit judge denied her motion for a directed verdict on the misprision charge, stating:

[I]t appears that this case falls right within the definition of a misprision of a felony as being criminal neglect of bringing an offender to justice after its commission, but without such previous concert with or subsequent assistance to him as will make the concealer an accessory after or before the fact. I think that there is evidence in the record, actions on the part of this Defendant constituting criminal neglect in bringing the offender to justice after its commission. Those acts could be not only the misstatements to the officers when she was being questioned, but it could be the misstatements to Mrs. Lewis earlier that morning. So there are several things in there that could be criminal neglect in bringing the offender to justice. This case falls very squarely within the definition of misprision of a felony, does not fall within the definition of accessory after the fact when applying the pre *State versus Collins* law. So . . . the motion for directed verdict as to accessory after the fact is granted. The motion for directed verdict as to misprision of a felony is denied.

Appellant contends her visit to the victim's daughter and her initial statement to the police formed the basis for her prosecution for misprision of a felony. Appellant asserts she "was clearly a suspect in the underlying offense at the time she was interrogated by the police. Accordingly, a prosecution for misprision cannot be based on her refusal to incriminate herself during interrogation. Furthermore, her comments to the victim's daughter did not divert the investigation of the crimes, but ultimately led directly to the arrest of appellant and her husband."

We agree with the trial court's reasoning in this regard. Although a private citizen has no duty to come forward and report knowledge of a crime, we find the holding in *Carson* clearly states that a person may not conceal his or her knowledge upon direct questioning by authorities so as to mislead them during their investigation of the crime. Concealment under these circumstances amounts to misprision of a felony. *See* Jack Wenik, Note, *Forcing Bystander to Get Involved: Case for Statute Requiring Witnesses to Report*

*Crime,* 94 Yale L.J. 1787, 1793 (1985) ("The majority view ... was that common law misprision of felony at the state level consisted of a failure to report a crime to the authorities plus an additional element—an evil intent or some positive act."). (citing *Carson*).

Here, Appellant intentionally misled the police during their investigation of Grier's murder and concealed her knowledge of the crime. According to Agent Weaver, when Appellant spoke with investigators during her first interview with them at the substation, she said nothing to indicate any untoward activity happened at the store, although she was given reasonable opportunities to tell them what she knew.

Under the law at that time, Appellant could not have been convicted as an accessory after the fact due to her presence at the scene. Additionally, she was not accountable as a principal. Further, during her first interview with police, she was questioned only as a witness. Appellant was not entitled to a directed verdict on this basis. *See Carson,* 274 S.C. at 319; 262 S.E.2d at 920 (stating "[w]hile it is true the privilege [against self-incrimination] sometimes works to bar prosecution for misprision, this is only when the statements concealed would incriminate the defendant as an accessory or principal in the protected felony," and the defendant's prosecution for misprision of a felony was proper where the defendant had concealed important information when police first questioned him which, when later disclosed, fully exculpated him from the crimes he witnessed); *see also Pope,* 382 A.2d at 893 ("That appellant ultimately admitted to the authorities the following day what may have actually occurred does not relieve her from the abrogation of her responsibility to have reported the crime when there were 'reasonable opportunities available.'"). We find the trial court committed no error in denying Appellant's directed verdict motion and submitting the misprision of a felony offense to the jury.

## *CONCLUSION*

For the foregoing reasons, Appellant's conviction and sentence for misprision of a felony are

**AFFIRMED.**

CONNOR and HOWARD, JJ., concur.